681 S.E.2d 81

**STATE ex rel. Dana December SMITH, Petitioner Below, Appellant,**

v.

**Thomas McBRIDE, Warden, Mt. Olive Correctional Complex, Respondent Below, Appellee.**

No. 34155.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 24, 2009.

Decided March 12, 2009.

George Castelle, Kanawha County Public Defender Office, Charleston, WV, M. Timothy Koontz, Williamson, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, WV, for Appellee.

DAVIS, Justice.[1]

This is an appeal by Dana December Smith (hereinafter "Mr. Smith") from an order of the Circuit Court of Kanawha County that denied his petition for a writ of habeas corpus. Mr. Smith filed the habeas corpus petition seeking a new trial from his two convictions for felony murder. In this appeal, Mr. Smith argues that the circuit court erred in finding that he was not entitled to a new trial based upon newly discovered evidence, and in considering an unauthenticated letter. After a careful review of the briefs and the record submitted on appeal, and having listened to the oral arguments of the parties, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On Monday, September 9, 1991, Robert McClain drove from his home in Ashland, Kentucky, to visit his mother, sixty-three year-old Margaret McClain, and his sister, thirty-six year-old Pamela Castaneda.[2] Ms. McClain and Ms. Castaneda lived together in the town of Leewood, West Virginia. Mr. McClain arrived at the home of his mother and sister at about 5:15 p.m. Mr. McClain placed his key in the door of the home, but found that the door was not locked.[3] When Mr. McClain entered the home, he found his mother and sister had been stabbed to death.[4] The police were summoned. After an investigation, the police arrested Mr. Smith on September 16, 1991, and charged him with the murder of Ms. McClain and Ms. Castaneda. In 1992, a grand jury indicted Mr. Smith on two counts of murder, two counts of aggravated robbery and one count of first degree sexual assault.[5]

### A. Underlying Trial

Mr. Smith's trial was conducted between November 23 and December 30, 1992. The following facts outline the evidence presented to the jury.

On Saturday, September 7, 1991, at around 4:30 p.m., Mr. Smith drove to the home of Steve Pritt in a four-door Dodge Aries.[6] Mr. Pritt lived in the town of Leewood, West Virginia. Mr. Pritt testified that Mr. Smith was wearing camouflage pants, military boots and a baseball hat. Mr. Smith was also wearing a green military belt that had a

---

1. Pursuant to administrative orders entered September 11, 2008, and January 1, 2009, the Honorable Thomas E. McHugh, Senior Status Justice, was assigned to sit as a member of the Supreme Court of Appeals of West Virginia commencing September 12, 2008, and continuing until the Chief Justice determines that assistance is no longer necessary, in light of the illness of Justice Joseph P. Albright.

2. Mr. McClain was accompanied by his girlfriend.

3. Mr. McClain had lived with his mother and sister around the beginning of 1991. He moved out in August of 1991.

4. Ms. McClain was stabbed at least fourteen times, and Ms. Castaneda was stabbed at least fifteen times.

5. Ms. Castaneda was the victim of the sexual assault charge.

6. Mr. Smith was driving a car that was owned by Mary Walls. Mr. Smith had been temporarily living with Ms. Walls and her son, Sam Walls, in West Logan, West Virginia.

plastic canteen attached to it,[7] along with a leather sheath that contained a knife. Mr. Pritt spoke with Mr. Smith for about a half hour. During that conversation Mr. Smith asked Mr. Pritt if he had seen Robert McClain, the son of Margaret McClain. Mr. Pritt informed Mr. Smith that Robert had gone to Kentucky.

After Mr. Smith left the home of Mr. Pritt, he wrecked the car he was driving in a single vehicle roll-over accident on Cabin Creek Road, in Kanawha County, West Virginia. The accident occurred at around 5:00 p.m. Kenneth Russell, the Fire Chief of Cabin Creek, was driving along Cabin Creek Road and witnessed the accident. Mr. Russell stopped at the accident site and spoke briefly with Mr. Smith before calling for assistance on his radio. After reporting the accident, Mr. Russell left the scene briefly. After Mr. Russell left the accident scene, a man by the name of Harold Brown stopped at the accident. Mr. Brown testified that after he noticed that no one appeared to be injured, he was about to drive off when Mr. Smith tapped on the window of his vehicle and asked for a ride.[8] Mr. Brown drove Mr. Smith to the outskirts of the town of Leewood and let him out.[9]

The State called two witnesses, Cathy Bragg and Ernest Jarrell, who lived a few houses away from the home of the murder victims. Both witnesses testified that on September 7th, they saw a man walking in the area wearing camouflage pants, military boots,[10] and a military belt that had a canteen attached to it, along with a sheath that contained a knife. Neither witness was able to identify the man as being Mr. Smith.

The State introduced a videotaped deposition of Dora Back, a neighbor whose house was right next door to the victims' house.[11] Ms. Back testified that she had talked with the victims during the course of the day on September 7th. Ms. Back indicated that when she left her home at 5:00 p.m. to visit one of her daughters, both victims were still alive. Further, Ms. Back testified that when she left home, the victims' white Ford Taurus station wagon was in the driveway.[12] The State also called Rachel Britton, one of Ms. Back's daughters. Ms. Britton, who lived with her mother, stated that she came home at 6:00 p.m. on September 7th and noticed that the victims' car was gone. Dr. Irvin M. Sopher, the State Chief Medical Examiner, testified that it was possible that the victims died on September 7th, between 5:00 p.m. and 6:00 p.m.

At about 6:45 p.m., on September 7th, Mr. Smith drove to the home of a friend, Anita McKinney. Ms. McKinney testified that Mr. Smith was driving a muddy, light-colored car. According to Ms. McKinney, Mr Smith did not get out of the car, and they talked for a few minutes before he left.

Between 7:30 p.m. and 8:00 p.m., on September 7th, Mr. Smith drove to the home of another friend, Jeanette Laws. Ms. Laws testified that Mr. Smith drove to her house in a white Ford Taurus station wagon. Mr. Smith told Ms. Laws that the car belonged to his stepfather. According to Ms. Laws, Mr. Smith was wearing a T-shirt with a teddy bear emblem on it. Ms. Laws stated that, after Mr. Smith entered her home, he took off the teddy bear T-shirt and dropped it on the floor.[13] According to Ms. Laws, the teddy bear T-shirt had blood on it. Ms. Laws

---

7. Mr. Pritt was able to identify the canteen as being plastic because Mr. Smith took the canteen out of its cover.

8. Mr. Brown was not able to identify the accident victim as Mr. Smith. However, during cross-examination, counsel for Mr. Smith admitted that the person picked up by Mr. Brown was, in fact, Mr. Smith.

9. Mr. Smith was eventually arrested on September 11, 1991, and charged with leaving the scene of an accident.

10. Mr. Jarrell only saw the man from the waist up and did not see the boots.

11. Ms. Back's deposition was taken because she had moved to Indiana.

12. Ms. Back did not know the model of the car.

13. Ms. Laws stated that Mr. Smith had cuts on his body. Mr. Smith informed Ms. Laws that the cuts were inflicted during a fight he had had with friends of his ex-girlfriend. Ms. Laws treated some of the wounds with ointment and band-aids.

testified further that Mr. Smith appeared nervous and could not sit still. Mr. Smith left Ms. Laws' home after about twenty minutes. Mr. Smith left the teddy bear T-shirt at Ms. Laws' home. Patricia Lee, the daughter of Ms. McClain and sister of Ms. Castaneda, testified that the teddy bear T-shirt belonged to Ms. Castaneda. Ms. Lee's brother, Robert McClain, also testified that the teddy bear T-shirt belonged to Ms. Castaneda. L.C. Harrison, of the Federal Bureau of Investigation, testified that DNA testing [14] was performed on the bloodstains found on the teddy bear T-shirt and blood samples from the victims and Mr. Smith. Ms. Harrison indicated that DNA from the bloodstains on the teddy bear T-shirt matched the DNA profiles of Mr. Smith and Ms. Castaneda.

After Mr. Smith left the home of Ms. Laws, he went back to the home of Ms. McKinney. Ms. McKinney testified that Mr. Smith entered her home on his second visit. While at the home, Ms. McKinney also treated the cuts that were on Mr. Smith's body. Ms. McKinney stated that Mr. Smith informed her that he had received the cuts after he fell into a briar patch. Mr. Smith also told Ms. McKinney that the car he was driving belonged to his mother. Ms. McKinney testified that she allowed Mr. Smith to spend the night at her home. Mr. Smith left the home at about 10:00 a.m. on Sunday, September 8th. Ms. McKinney testified further that Mr. Smith returned to her house later in the evening of September 8th. During that visit, Mr. Smith gave Ms. McKinney's daughter a Pizza Hut noid doll. Mr. Smith left the home after several hours.[15] Detective J.W. Johnson, of the Kanawha County Sheriff's Department, testified that the Pizza Hut noid doll was later determined to be missing from the victims' car.[16]

On Sunday, September 8th, at around 11:30 a.m., Mr. Smith drove to the home of Denise Morgan. Ms. Morgan testified that Mr. Smith was driving a white Ford Taurus station wagon. Ms. Morgan stated that Mr. Smith gave her a VCR, CB radio and a Walkman radio headset and asked her to keep them for him. Mr. Smith also told Ms. Morgan that he had stolen the car he was driving because someone had stolen the car he had taken from Mary Walls.[17] Mr. Smith told Ms. Morgan that he was going to ditch the car on the outskirts of Logan. Detective R.J. Flint, of the Kanawha County Sheriff's Department, testified that the CB radio came from the victims' car. Detective Flint also testified that the serial number on the VCR matched that of a VCR that was rented by Ms. Castaneda from a local rent-to-own store. Paula Sydenstricker, the daughter of Ms. McClain and sister of Ms. Castaneda, identified the Walkman radio headset as belonging to Ms. Castaneda.[18]

---

**14.** DNA stands for "deoxyribonucleic acid." *State v. Calloway*, 207 W.Va. 43, 47, 528 S.E.2d 490, 494 (1999).

**15.** Ms. McKinney testified further that she received a telephone call from Mr. Smith on Tuesday, September 10th. During that telephone call, Mr. Smith informed Ms. McKinney that he was a suspect in a murder case, and that he wanted her to tell the police that he had spent the past weekend at her home, and that he did not drive a car to her home; instead, she was to inform the police that he had hitchhiked to her home.

**16.** During the trial, Detective Johnson called the doll a "Domino's Pizza noid cartoon figure." However, he was referring to the Pizza Hut noid doll described by Ms. McKinney.

**17.** A day or two after Mr. Smith left Ms. Morgan's home, she saw a television news program that had a picture of a car that looked like the one Mr. Smith had driven to her home. After seeing the news program, Ms. Morgan contacted her father, who was a deputy sheriff, and informed him of the items Mr. Smith had left at her home.

**18.** Detective Johnson testified that the victims' car was found abandoned in Logan County. Detective Flint testified that the victims' car was not "hot-wired or started without the aid of a key." Ms. Sydenstricker testified that the keys to the victims' car were always hung on a nail that was in the kitchen door of the victims' home. The police were never able to locate the keys for the car. During Mr. Smith's opening statement, defense counsel informed the jury that "Dana Smith, when he got to the McClain house, he saw a car sitting there available, and he needed it, and he took the car." Further, at the close of the State's case-in-chief, defense counsel made a motion for a directed verdict and reiterated to the trial court that "[i]n opening statement the defense admitted that Mr. Smith stole a vehicle that was owned by Mrs. McClain or Ms. Castaneda." Additionally, five times during defense counsel's

At around noon on September 8th, Mr. Smith returned to the Walls' home, where he had been temporarily living for several months. Sam Walls testified that Mr. Smith was not driving when he returned. Mr. Walls indicated that Mr. Smith stated that he had returned the car of Mr. Walls' mother, Mary Walls, but that someone must have stolen it from the driveway. Mr. Walls testified that, on September 9th, Ms. Walls asked Mr. Smith to cut a roast. Mr. Smith asked Mr. Walls to cut the roast, and suggested that Mr. Walls use a hunting knife that Mr. Walls used for cutting deer. Mr. Walls retrieved the hunting knife and observed that it did not have the deer hairs that he had previously left on it.[19] Mr. Walls testified that the hunting knife "had something that looked like blood and sand on it."[20] There was also testimony by Mr. Walls that he owned an aluminum canteen, and that he once owned a plastic canteen, but that he lost it in some woods. Dr. Sopher testified that the stab wounds inflicted on the victims were consistent with Mr. Walls' hunting knife. Detective Johnson testified that during his investigation he discovered a canteen and cover on the floor of the victims' home. Ms. Lee and Mr. McClain testified that neither Ms. McClain nor Ms. Castaneda owned a canteen.

At the close of the State's evidence, Mr. Smith called five witnesses.[21] The first witness called by Mr. Smith was Betty Coleman. Ms. Coleman's testimony was simply that she had previously purchased T-shirts from Ms. Castaneda at a bar called "the Route 60 Lounge in St. Albans."[22] The second witness called by the defense was John Gilbert. Mr. Gilbert testified that he was a neighbor of the victims. According to Mr. Gilbert, on the night of September 7th, between 11:00 p.m. and 1:00 a.m., he saw a car parked near the victims' residence. Mr. Gilbert was unable to identify the car or who was in the car. The third witness called by defense counsel was Lorena Lambert. Ms. Lambert was the owner of the Route 60 Lounge. Ms. Lambert testified that Ms. Castaneda sold T-shirts at the bar. The fourth witness called by the defense was Molly Walker. Ms. Walker testified that she was an employee at the Route 60 Lounge, and that she had bought T-shirts from Ms. Castaneda. The fifth witness called by defense counsel was Thomas Fisher. Mr. Fisher testified that he was a friend of Ms. Castaneda. Mr. Fisher stated that Ms. Castaneda informed him that her husband once kidnapped her and took her to Mexico to engage in prostitution.[23] According to Mr. Fisher, during the summer of 1991, Ms. Castaneda informed him that she felt that she was being followed; but, did not know who was following her.[24]

■ After the case was submitted to the jury, the jury returned a verdict finding Mr. Smith guilty of two counts of murder during the commission of aggravated robbery, *i.e.*, felony murder.[25] The jury did not recom-

closing argument he acknowledged that "Mr. Smith ... stole a car and he left." Finally, during oral arguments before this Court, counsel for Mr. Smith conceded that Mr. Smith stole the victims' car.

19. There was also testimony from Mr. Walls that the sheath for the knife had a tear on it that was not present when he last used it. In addition, Mr. Walls indicated that his camouflaged webbed belt had been found hidden in a box at this home and that a bloodstain was on it.

20. Mr. Walls testified that, during the week of September 7th, Mr. Smith had asked if he could wear his hunting knife, but that he had told Mr. Smith not to bother the knife.

21. Mr. Smith did not testify. His defense at the trial was that he stole the victims' car, but that he did not enter their home nor did he kill them.

22. The State had introduced testimony from Ms. Lee and Mr. McClain that Ms. Castaneda made custom designed T-shirts for family members.

23. The State introduced evidence establishing that Ms. Castaneda and her husband, Luis Castaneda, had been separated for about a year before her death. Further, there was evidence to show that Mr. Castaneda was working and living in New York at the time of the murders.

24. The last piece of evidence put on by Mr. Smith was the replaying of a portion of a hearing he had had in magistrate court, which had previously been introduced by the State.

25. "Unlike traditional first degree murder, felony-murder does not require proof of the elements of malice, premeditation, or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or

mend mercy. On January 28, 1993, the trial court sentenced Mr. Smith to two terms of life imprisonment without the possibility of parole. Mr. Smith filed a petition for appeal with this Court, which was refused.

### B. Habeas Corpus Proceeding

Mr. Smith filed the instant habeas corpus petition in 1997. The habeas petition was amended several times. An omnibus hearing was held on the habeas petition on January 17 and 18, 2006. The issue presented by Mr. Smith during the omnibus hearing was whether or not he was entitled to a new trial based upon newly discovered evidence. The newly discovered evidence concerned statements by Tommy Lynn Sells, an inmate on death row in the state of Texas.[26]

Mr. Sells testified during the omnibus hearing, via a videotaped deposition, that he killed Ms. McClain and Ms. Castaneda.[27] According to Mr. Sells, he met Ms. Castaneda at a Saint Albans bar off of Highway 60.[28] Mr. Sells testified that Ms. Castaneda bought drugs from him while at the bar. Eventually, they left the bar together in Ms. Castaneda's car and drove to her home.[29] Mr. Sells stated that Ms. Castaneda allowed him to stay in the attic of her home for about three days.[30] According to Mr. Sells, Ms. McClain did not know that he was living in the attic. Mr. Sells described the attic as an upstairs apartment that had a bedroom and bathroom. Mr. Sells stated that on the last day that he was at the home, Ms. McClain discovered that he was staying in the attic. After Ms. McClain discovered that he was staying in the attic, an argument ensued. He picked up a knife from the kitchen sink and stabbed both victims to death. Additionally, Mr.

Sells stated that a small dog was in the house and barked, but that he did not harm the dog nor would he harm any animal. Mr. Sells also testified that he remembered the home had a brown couch with a black afghan on it. Mr. Sells testified further that he stole a CB radio from the house and left on foot. Mr. Sells could not recall whether the victims' car was in the driveway. Mr. Sells testified that he was later incarcerated in jail in West Virginia, and that, during that time, Mr. Smith was also in the same jail.[31] Subsequently, Mr. Sells was sentenced to prison. Mr. Smith was in the same prison at the time of Mr. Sells' confinement. Mr. Sells testified that he did not have any contact with Mr. Smith while they were in jail and prison together.

In addition to Mr. Sells' videotaped deposition, the circuit court heard live testimony from several witnesses and reviewed the written deposition testimony of two witnesses. One of the written depositions was that of Sergeant J. Allen, of the Texas Department of Public Safety. Sergeant Allen indicated that while Mr. Sells was in custody for the victim he killed in Texas, Mr. Sells gave him unsolicited information about the murders of Ms. McClain and Ms. Castaneda.[32] Sergeant Allen contacted West Virginia authorities and was told that Mr. Smith had been convicted of the murders. Sergeant Allen informed Mr. Sells that someone was in prison for the crimes. Mr. Sells responded back, "I didn't tell you I committed those homicides. I told you I had a dream about it last night." One of the witnesses who testified was Diane Fanning, the author of a book about Mr. Sells.[33] Ms. Fanning testified that, during an interview

---

the attempt to commit, one of the enumerated felonies." *State v. Lanham*, 219 W.Va. 710, 715, 639 S.E.2d 802, 807 (2006) (internal quotations and citation omitted).

**26.** Mr. Sells was sentenced to death for the 1999 murder of Kaylene Harris. *See Sells v. State,* 121 S.W.3d 748 (Tex.Crim.App.2003).

**27.** During his deposition, Mr. Sells indicated that he had killed over thirty people.

**28.** Mr. Sells stated that he came to West Virginia in August of 1991.

**29.** Mr. Sells testified that he had a truck; but, that he left it at the bar.

**30.** Mr. Sells could not recall the day on which he met Ms. Castaneda.

**31.** It appears that Mr. Sells was in jail on sexual assault and malicious wounding charges.

**32.** The conversation occurred on April 12, 2000.

**33.** Ms. Fanning's book is entitled "Through the Window: The Terrifying True Story of Cross-Country Killer Tommy Lynn Sells" (2003).

with Mr. Sells,[34] on November 6, 2001, he stated that he did not kill Ms. McClain and Ms. Castaneda.[35] Further, Ms. Fanning stated that Mr. Sells informed her "that Mr. Smith had gotten someone else to write a letter to him about the crimes."

The trial court also heard testimony from Detective Flint and Thomas Lee,[36] that one of the victims' two dogs was found killed and hidden in a laundry room in the house. There was additional evidence to show that the victims did not have a couch with a black afghan on it. Further, there was evidence to show that the victims had only one CB radio, and that CB radio was taken by Mr. Smith. Finally, there was evidence showing that the victims' home did not have an upstairs bedroom and bathroom.

On September 14, 2007, the circuit court entered an order finding Mr. Sells' confession was not credible and therefore denied Mr. Smith habeas corpus relief. This appeal followed.

## II.

## STANDARD OF REVIEW

■ In this appeal, we are called upon to review an order of the trial court that was rendered after an omnibus habeas corpus hearing that included testimony by witnesses.[37] The trial court's order set out findings of fact and conclusions of law. We previously have held that "[f]indings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong." Syl. pt. 1, *State ex rel. Postelwaite v. Bechtold,*

34. Ms. Fanning indicated that, during her research for the book, she interviewed Mr. Sells for more than fifty hours.

35. On Wednesday, April 7, 2004, Ms. Fanning sent an e-mail to a former habeas attorney for Mr. Smith, in which Ms. Fanning indicated that Mr. Sells "told me that he is guilty of this murder this Monday."

36. Mr. Lee was the son-in-law of Ms. McClain.

37. *See* Rules Governing Post–Conviction Habeas Corpus Proceedings in West Virginia, Rule 9(b), ("If the court determines that an evidentiary

158 W.Va. 479, 212 S.E.2d 69 (1975). We have explained more fully that,

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a de novo review.

Syl. pt. 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006). With these standards in mind, we now consider the issues presented in this appeal.

## III.

## DISCUSSION

### A. Admission of Mr. Sells' Recantation Letter

■ The first issue that we will address concerns Mr. Smith's contention that, during the habeas corpus proceeding, the circuit court improperly considered a letter wherein Mr. Sells recanted his confession. The facts surrounding the recantation letter are as follows.

After the omnibus hearing was held, in January 2006, the State received a letter in February 2006 from Deputy J. Poore, of the Val Verde County, Texas, Sheriff's Department. The letter was dated February 7, 2006, was signed by Mr. Sells and contained the signature of two witnesses. In the letter, Mr. Sells indicated that the information he gave regarding the murder of Ms. McClain and Ms. Castaneda came from various sources, and not from firsthand knowledge or his participation in the murders.[38] Mr.

hearing is necessary, the court shall hold a hearing and/or take evidence on the matters raised in the petition. The court shall pass upon all issues of fact without a jury [.]").

38. The text of the recantation letter is as follows:

> In the year 2000, I was in the Val Verde County Jail in Del Rio Texas and waiting for my trial. I received a letter from Indiana. I don't know if this letter was signed or not. The person writing this letter wanted me to take the blame for a murder in West Virginia. A Dana December Smith was already in jail for this murder. The writer wanted me to say that I had commit-

Smith contends that the letter was not authenticated pursuant to Rule 901(a), of the West Virginia Rules of Evidence, and therefore should not have been considered by the circuit court. We find no merit to this argument.

Rule 901(a) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See* Syl. pt. 4, *State v. Jarvis,* 199 W.Va. 38, 483 S.E.2d 38 (1996). We have noted that "the authentication requirement of the West Virginia Rules of Evidence requires only that a party introducing evidence demonstrate that the evidence is in fact what its proponent claims." *State v. Knuckles,* 196 W.Va. 416, 423, 473 S.E.2d 131, 138 (1996). The State correctly points out that the authenticity requirement of Rule 901(a) is relaxed in habeas corpus proceedings.

■ Pursuant to Rule 8(b) of the Rules Governing Post–Conviction Habeas Corpus Proceedings in West Virginia, letters, documents, exhibits, and affidavits "may be submitted and considered as part of the record." It is also provided in Rule 8(d) that "[t]he court *may* require the authentication of any material under [Rule 8(b)]." (Emphasis added). The use of the word "may" in Rule 8(d) connotes discretion. *See Rosen v. Rosen,* 222 W.Va. 402, 664 S.E.2d 743, 750 (2008) ("An elementary principle of statutory construction is that the word 'may' is inher-

ently permissive in nature and connotes discretion."); *In re Cesar L.,* 221 W.Va. 249, 261, 654 S.E.2d 373, 385 (2007) ("[T]he word 'may' generally is afforded a permissive connotation, which renders the referenced act discretionary, rather than mandatory, in nature."); *State v. Hedrick,* 204 W.Va. 547, 552, 514 S.E.2d 397, 402 (1999) ("The word 'may' generally signifies permission and connotes discretion."). Therefore, and we hold, under Rule 8(d) of the Rules Governing Post–Conviction Habeas Corpus Proceedings in West Virginia, a letter, document, exhibit, or affidavit may be admitted into evidence without being authenticated, unless authentication is required by the trial court.

■ We have previously noted, and now hold, that "a trial judge's ruling on authenticity will not be disturbed on appeal unless there has been an abuse of discretion." *State v. Jenkins,* 195 W.Va. 620, 625, 466 S.E.2d 471, 476 (1995). Under the facts of this case, we do not believe the circuit court abused its discretion, if it in fact considered Mr. Sells' letter.

A hearing pertaining to Mr. Sells' letter was held on February 17, 2006. At the hearing, the State informed the trial court that, on February 6th, Deputy Poore telephoned the State with information that Mr. Sells had recanted his confession. The State asked Deputy Poore to have the recantation placed in writing. Upon receipt of Mr. Sells' recantation letter, the State provided Mr.

ted the murder and they gave me details about the murder. They promised to send me newspapers and magazines while I was in jail. This sounds like a small things [sic] but they are big things if you are locked up. They said I would be doing Smith a favor and one more wouldn't hurt me being I had already admitted to so many murders.

The next day or so I met with the Texas Rangers and I told them I did this murder. I gave details that were in the letter. They talked to West Virginia and told me I had made the story up.

After I was on death row I received a letter written by Windy Campbell [former habeas counsel for Mr. Smith]. I received this letter from my attorney Terry McDonald. Windy had written the letter to McDonald and he passed it on to me. The letter was about the murder that Smith was in jail for. The letter gave details about the killing, who was killed and where. Between the

two letters I had a lot of details about the murder.

Latter [sic] Windy Campbell showed up at the prison and talked to me about the murder. Between the two letters and some guesswork I admitted to the killing and gave he [sic] the details of the killings.

It was kind of like a chess game talking with her and I figured everyone had been messing with me so I messed with them back.

At this time I want to recant my confession. I did not kill these women. I never stayed at their house, I don't know where they lived and never met them. I've got an execution date and I want to set the record straight. [initialed TLS]

| Signature | Signature |
|---|---|
| Witness | Tommy Lynn Sells |

| Signature | Date: 02/07/2006 |
|---|---|
| Witness | Time 10:31 PM |

Smith and the court with a copy of the letter. The State asked the trial court to consider the letter as evidence. Counsel for Mr. Smith provided a lengthy objection that essentially attacked the veracity of the substance of the letter. Mr. Smith personally interjected an objection to the letter on the grounds of authenticity. Defense counsel thereafter reiterated the objection on the grounds of authenticity. The trial court ruled that it would take the matter under advisement. The State thereafter informed the trial court that "if the Court rules, if you will not consider this statement, after a chance to review everything, we would ask leave of the Court to be able to take a deposition for [sic] Mr. Sells[.]" Mr. Smith objected to having Mr. Sells deposed again. The trial court indicated that it would take all the issues under advisement and render a ruling "within the next two weeks or so[.]" The trial court entered an order on April 10, 2006, granting the State's motion to depose Mr. Sells. The State's brief indicates that the deposition never took place because Mr. Sells refused to cooperate with the State.

In view of the record submitted in this case, we are unable to definitively conclude that the trial court considered Mr. Sells' letter. Insofar as the State informed the trial court that it wanted to depose Mr. Sells *only if* the court refused to consider the letter, we must presume that the court did not consider the letter because it authorized the State to depose Mr. Sells. Mr. Smith points out that the trial court's order denying habeas relief referred to recantations by Mr. Sells. The only reference to Mr. Sells' recantations contained in the trial court's detailed and lengthy order is the following: "Tommy Lynn Sells has recanted his 'confession' on more than one occasion." We cannot attribute this passage as conclusively showing that the trial court considered Mr. Sells' recantation letter, because there was evidence by Sergeant Allen and Ms. Fanning that indicated Mr. Sells denied committing the murders. In addition, during the February 17th hearing, there was a statement made to the trial court that Mr. Sells recant-

ed his confession in a newspaper called Del Rio Herald.

■ Assuming, for the sake of argument, that the trial court considered the recantation letter over an authentication objection, we do not find that such consideration was an abuse of discretion. During the February 17th hearing and in the brief submitted on appeal, Mr. Smith focused upon the veracity of the substantive statements in the recantation letter. However, this Court has held that establishing authenticity does not "require[ ] a showing of the truth of the assertions contained in a writing[.]" *State v. Jenkins*, 195 W.Va. 620, 624, 466 S.E.2d 471, 475 (1995) (internal quotations and citation omitted). The issue of "[w]hether or not the evidence is credible is for the trier of fact to determine." *Jenkins*, 195 W.Va. at 626, 466 S.E.2d at 477. Mr. Smith has not shown, either during the February 17th hearing or in this appeal, that the letter is not what had been claimed by the State. The State informed the trial court, during the February 17th hearing, that Deputy Poore was asked to have Mr. Sells' recantation reduced to writing and forwarded to the State. The State tendered to the trial court the recantation letter it requested from Deputy Poore. For the limited purpose of authenticity, Mr. Smith has failed to show that the letter is not the document requested by the State and forwarded by Deputy Poore. Had Mr. Smith presented evidence "that would tend to prove that the document in question is a forgery or otherwise did not come from [Deputy Poore], [Mr. Smith] would have a valid objection challenging its authenticity." 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 9–1(A) (4th ed. 2000).

The appellate court in *Blango v. Thornburgh*, 942 F.2d 1487 (10th Cir.1991), confronted an authenticity issue similar to that presented by Mr. Smith. In *Blango*, the defendant was convicted of a crime by the District of Columbia,[39] but was ordered to serve his sentence in a federal prison pursuant to a memorandum of understanding between the Federal Bureau of Prisons and the District of Columbia Board of Corrections. The defendant filed a habeas corpus petition

**39.** The opinion did not indicate the nature of the
crime committed.

in a federal district court arguing that his detention in a federal prison was unlawful. The district court denied relief. The defendant appealed. One of the issues raised by the defendant in his appeal was that the district court improperly considered a copy of the memorandum of understanding between the Federal Bureau of Prisons and the District of Columbia Board of Corrections because it was not authenticated. The appellate court rejected the argument as follows:

We are guided by Rule 7(d) of the Rules Governing Section 2254 Cases in the United States District Courts, which provides: "The court *may* require the authentication of any material under subdivision[s] (b) and (c)." [Emphasis in original.] We deem the [memorandum of understanding] in question to be part of an expansion of the trial court record.... As such, authentication of the exhibit would be discretionary under Rule 7(d).... While petitioner[ ] ... raised the issue of whether the document had been authenticated under the Federal Rules of Evidence, [he] did not challenge the truth of the government's allegation that the document ... was an accurate copy of the memorandum of understanding[.]

Thus, petitioner has not come forward, either in ... the district court or in his brief on appeal, with any indication that the document ... was not a reliable copy of the memorandum of understanding[.]

*Blango*, 942 F.2d at 1493.[40]

Based upon the foregoing, to the extent that the trial court may have considered Mr. Sells' recantation letter over Mr. Smith's authentication objection, there was no abuse of discretion in so doing.

### B. Denial of Habeas Relief

■■■ Mr. Smith contends that, based upon Mr. Sells' confession, he satisfied all of the elements for obtaining a new trial based upon newly discovered evidence. This Court has held that "[a] new trial on the ground of after discovered evidence or newly discovered evidence is very seldom granted and the circumstances must be unusual or special."

Syl. pt. 9, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966). This Court has indicated, with respect to a newly discovered confession, that

No one would doubt that a confession by another person to the crime, if discovered after trial, could be a ground for a new trial on the basis of newly discovered evidence. A confession by another person, however, does not invariably require a new trial; the integrity of the confession is for the trial court.

*State v. King*, 173 W.Va. 164, 165–66, 313 S.E.2d 440, 442 (1984). *See also Fast v. State*, 221 So.2d 203, 205 (Fla.Dist.Ct.App. 1969) ("A trial court is not bound to accept a confessor's confession[.]"); *People v. Cress*, 468 Mich. 678, 664 N.W.2d 174, 182 (2003) ("[I]t is within the trial court's discretion to determine the credibility of the confessor."). The factors that must be satisfied in order to obtain a new trial based upon newly discovered evidence are as follows:

"A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his [or her] affidavit that [the defendant] was diligent in ascertaining and securing [the] evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. Syl. pt. 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894)." Sylla-

---

**40.** Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts was amended in 2004. As a result of the amendment, the language in Rule 7(d), which deals with authentication of materials, has been moved to revised Rule 7(a).

bus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979).

Syl. pt. 3, *In re Renewed Investigation of State Police Crime Lab., Serology Div.*, 219 W.Va. 408, 633 S.E.2d 762 (2006). "If any of the foregoing five essential requirements is not satisfied or complied with, a new trial will not be granted on the ground of newly discovered evidence." *State v. Crouch*, 191 W.Va. 272, 276, 445 S.E.2d 213, 217 (1994). *See also State v. Helmick*, 201 W.Va. 163, 167–68, 495 S.E.2d 262, 266–67 (1997).

In the instant case, the trial court denied Mr. Smith a new trial because of his failure to satisfy the fourth prong of the test. It has been noted that

"[n]ewly discovered evidence satisfies the [fourth] prong of the ... test if it weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability. If the defendant is seeking to vacate a sentence, the [fourth] prong requires that the newly discovered evidence would probably yield a less severe sentence [or acquittal].

*Riechmann v. State*, 966 So.2d 298, 316 (Fla. 2007) (internal quotations and citations omitted). The trial court specifically found that, "[b]ased on the implausibility of Tommy Lynn Sells' confession, as well as the lack of integrity of the confession, this Court does not believe there is evidence ... that would produce an opposite result at a second trial on the merits."

■ Here, Mr. Smith argues that Mr. Sells' confession would bring about a differ-ent result at a new trial because the details that Mr. Sells knew about the victims and the crime scene are credible. Mr. Smith listed the following as details from Mr. Sells' confession: (1) Sells committed a double homicide (2) in Kanawha County, West Virginia, (3) in September 1991, (4) the victims were a mother and daughter, (5) the victims resided on Cabin Creek near the Boone County line, (6) the daughter's name was Pamela, (7) Sells met Pamela at the Route 60 Lounge, (8) the elderly mother was in poor health, (9) the victims owned a white Ford Taurus automobile, (10) Sells stayed in the victims' upstairs attic for two or three days prior to the murders, (11) Sells traded the victims' television set for narcotics,[41] (12) during an argument over the sale of the television, Sells repeatedly stabbed the victims, (13) the stabbing was committed in the downstairs area of the residence, (14) Sells removed the victims' pants to make the attack look sexually motivated, and (15) Sells left the victims' automobile behind and hitchhiked out of the area.[42]

The State argues that the so-called details that Mr. Sells knew concerning the crime could have been obtained from a variety of public sources, such as newspaper articles. More importantly, however, the State argues that the lack of credibility of Mr. Sells' confession rested upon four major inaccuracies in his testimony about the crimes.

First, Mr. Sells described the attic of the victims' home as having a bedroom and bathroom. However, the attic did not have a

---

**41.** In this appeal, Mr. Smith takes the position that Mr. Sells stole a television set from the victims and sold it for drugs. This version of events was given by Mr. Sells to Texas law enforcement officials. However, during his deposition, Mr. Sells stated that Ms. Castaneda sold the television set and used the money to pay him for drugs that he had given to her.

**42.** During the habeas corpus hearing, Mr. Smith introduced several witnesses who attacked the credibility of Ms. Harrison's DNA testimony and Dr. Sopher's determination of the time of death of the victims. The circuit court found, and we agree, that the testimony of the witnesses did not constitute newly discovered evidence, nor could the evidence form the basis for a new trial. *See* Syl. pt. 2, *State v. Stewart*, 161 W.Va. 127, 239 S.E.2d 777 (1977) ("A new trial on the basis of newly-discovered evidence will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. However, when the newly-discovered impeachment evidence comes within the following rules, a new trial will be granted: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) The facts must appear in his affidavit that the party was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) The evidence must be new and material, and not merely cumulative. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits.").

bathroom and only contained a mattress. Further, it was pointed out during the habeas corpus hearing that a trial exhibit was incorrectly marked as being a photo of the upstairs bedroom and bathroom when, in fact, the photo depicted a downstairs bedroom and bathroom. Thus, the State contends that Mr. Sells' description of the attic was based upon the mislabeled trial exhibit, not from having stayed in the attic.

Second, Mr. Sells testified that the victims' home had a brown couch with a black afghan on it. However, the victims did not have an afghan. The State points out that an exhibit was introduced during the trial that had a brown couch and black afghan, but the exhibit was a photograph of a residence that was not that of the victims. Thus, the State argues that Mr. Sells' description of the couch and afghan was based upon a trial exhibit that depicted the residence of someone else.

Third, Mr. Sells testified that he stole a CB radio from the victims' home. However, the State points out that, during the trial, it was established that the CB radio was stolen by Mr. Smith and given to Ms. Morgan. No evidence was ever introduced to show that the victims had two CB radios.

Fourth, Mr. Sells testified that the victims only had one dog, that he did not harm the dog, and that he would not harm animals. However, during the habeas corpus hearing, the evidence showed that the victims had two dogs, a Chinese Pug and a Chihuahua. The Chinese Pug was found alive and in a cage inside the home. The Chihuahua was found dead and hidden in a laundry room of the home.[43]

■■■ This Court agrees with the trial court, and the State, that Mr. Sells' confession lacks credibility. *See United States v. Steel,* 458 F.2d 1164, 1166 (10th Cir.1972) ("A hearing was held by the trial judge; he found Culp's confession lacking in credibility. We find no abuse of discretion in denial of appellants' motion for a new trial."); *Love v. State,* 799 P.2d 1343, 1344 (Alaska Ct.App.1990) (affirming trial court ruling that confessor "was 'probably the most non-believable witness I've ever seen in a court' "). Mr. Sells' confession clearly shows that he provided blatant "incorrect" information about the crime scene. The fact that two of Mr. Sells' incorrect statements can be traced to improperly identified trial exhibits indicates that it is very plausible that someone supplied Mr. Sells with information about the murders. The logical conclusion to be reached from all of the inaccuracies in Mr. Sells' confession is that his numerous recantations were in fact true, *i.e.,* he did not murder Ms. McClain and Ms. Castaneda.[44]

---

43. The Chihuahua was discovered by Mr. Lee, during his inventory of the home as executor of the estate of both victims. Mr. Lee informed the police about his discovery.

44. In his brief, Mr. Smith invokes the "actual innocence" doctrine to argue that to deny him a new trial would violate the State and federal constitutions. This argument has no merit. In federal jurisprudence, the phrase "actual innocence" was developed as a term of art. *See Dellinger v. State,* 279 S.W.3d 282, 295 (Tenn. 2009) ("[A] freestanding claim of actual innocence based on new scientific evidence is cognizable in an initial petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act."); *Ex parte Swearingen,* Nos. WR–53, 613–08 & WR–53, 613, 09, 2009 WL 249759, at *8 (Tex.Crim.App. Jan. 22, 2009) (Cochran, J., concurring) ("Texas is one of the very few American jurisdictions that recognizes, in the habeas corpus context, a free-standing claim of actual innocence."). The actual innocence doctrine was developed for the purpose of permitting federal courts to review claims by a defendant that were procedurally barred:

> An actual innocence claim is a gateway through which a habeas petitioner [may] have his otherwise barred constitutional claim considered on the merits. To succeed, the petitioner must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Further, "actual innocence" requires the petitioner to show factual innocence, not mere legal insufficiency.

*Barreto–Barreto v. United States,* 551 F.3d 95, 102 (1st Cir.2008) (internal quotations and citation omitted). *See also Melson v. Allen,* 548 F.3d 993, 1002 (11th Cir.2008) ("If the petitioner shows that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence, then he has made a 'gateway' claim of innocence allowing his otherwise barred constitutional claims to be considered on the merits." (internal quotations and citation omitted)). In the instant case, Mr. Smith was not procedurally barred from bringing his newly discovered evidence claim; therefore, the "actual innocence" doctrine has no application. Fur-

The facts of this case have striking similarities to the decision in *People v. Cress*, 468 Mich. 678, 664 N.W.2d 174 (2003). The defendant in *Cress*, Thomas Cress, was convicted by a Michigan jury of felony murder in 1985. The victim was named Patty Rosansky. In 1997, Mr. Cress sought a new trial based upon newly discovered evidence. The newly discovered evidence was a confession by Michael Ronning, an inmate at an Arkansas prison. Mr. Ronning had initially confessed to killing three people in Michigan, but not Ms. Rosansky. While the police were administering a polygraph test to Mr. Ronning, concerning the three murders, he mentioned that he had also killed Ms. Rosansky. Mr. Ronning provided the following detailed information about the murder of Ms. Rosansky:

Ronning claimed: (1) Rosansky, the victim, calmly got into Ronning's car without a struggle and crouched down on the floor while he drove her to Fort Custer; (2) once at the woods, Ronning had Rosansky remove all her clothes except her socks, and they smoked a joint; (3) Rosansky was not distressed, but was rather "quite comfortable" with him, even laughing and giggling; (4) he tried to have sex with Rosansky in the car, but specifically remembered that he did not and could not have sex because he "was too loaded up on drugs"; (5) he may have penetrated Rosansky's vagina with his fingers, but did not penetrate her rectum; (6) when they got out of the car, he followed Rosansky as she walked, holding on to her hair; (7) he strangled Rosansky with his left arm in a headlock-type hold for approximately four minutes; (8) Rosansky did not fight back or struggle in any way; and (9) after he thought Rosansky was dead, he stood over her and threw a rock at her head one time.

*Cress*, 664 N.W.2d at 177.

As a result of Mr. Ronning's confession, the trial court initially granted Mr. Cress a new trial. However, the State asked the trial court to reconsider its ruling in light of new evidence establishing that Mr. Ronning had told "others" that he falsely confessed to Ms. Rosansky's murder. The trial court took evidence on the matter and subsequently vacated its new trial order and entered an order denying Mr. Cress a new trial. One of the grounds given by the trial court for denying Mr. Cress a new trial was set out as follows:

Perhaps the most compelling evidence which causes this Court to now conclude that Mr. Ronning is a false confessor comes from Mr. Ronning himself. In April, 1997, [the police] had Mr. Ronning attempt to show them where the scene of the crime was.... [E]ventually Mr. Ronning did come to an area where he believes the murder occurred. He stated on th[e] videotape that there was a clearing where he could turn his car around. He described where the car would have been, where the body was placed after he strangled her, from which direction he would have thrown the rock, and how far the rock would have gone "with the roll."

... The area where Mr. Ronning believes the murder occurred is a flat piece of ground, a clearing next to a two-track. There are no man-made landmarks in the immediate vicinity.

At the hearing in December, 1998, numerous photographs were admitted into evidence of the scene of the crime taken in 1983. Those photographs clearly show that Ms. Rosansky's body was not found in a flat, open area as described by Mr. Ronning. Rather, her body was found in a ravine. This ravine was not just a slight indentation in the ground. Each side rose to a height of seven or eight feet, according to the testimony of Trooper Zimmerman. The body was found at the bottom of the ravine, within view of a concrete well station. Mr. Zimmerman testified that the

ther, assuming that the actual innocence doctrine was applicable, the evidence presented at the habeas corpus proceeding did not establish, nor reasonably suggest, that Mr. Smith is innocent. *See United States ex rel Hernandez v. Pierce*, 429 F.Supp.2d 918, 926 (N.D.Ill.2006) ("A claim of actual innocence is only credible where a petitioner ... support[s] his allegations of constitutional error with new reliable evidence ... that was not presented at trial.... The petitioner must show that in light of this new evidence, it is more likely than not that no reasonable juror would have convicted him." (internal quotations and citation omitted)).

ravine and well station look similar in appearance today, compared to 1983. Indeed, Mr. Zimmerman testified that a metal roof vent shown in the 1983 crime scene photographs is still there. He had no difficulty locating the area where Ms. Rosansky's body was found.

When one compares the videotape of the area Mr. Ronning concludes was the scene of the crime (or as he said, "it was a place like this") to the photographs of the scene of the crime, the difference in topography and terrain is dramatic. This is not a situation where Mr. Ronning's recollection is clouded due to a lapse in time. On the 1997 videotape, Mr. Ronning describes the crime scene based on his recollection. When one compares his description of the crime scene to the actual crime scene, the only reasonable conclusion one can draw is that Mr. Ronning didn't know where the crime scene was because he did not commit the crime.

*Cress,* 664 N.W.2d at 180.

Mr. Cress appealed the trial court's order denying a new trial to the Michigan Court of Appeals. The Court of Appeals reversed the trial court's order and granted Mr. Cress a new trial. The State appealed that decision to the Michigan Supreme Court. The Supreme Court agreed with the trial court's findings as follows:

> After considering the conflicts between Ronning's confessions and the facts established at trial, the trial court concluded that Ronning was not a credible witness and was a false confessor. A false confession (i.e., one that does not coincide with established facts) will not warrant a new trial. . . .
>
> Ronning's confessions sharply deviated from the established facts regarding the crime. . . . [H]e could not find the location where the body was found, even when that location was shown to him and despite the fact that he claimed that he left Rosansky's body in an area that he lived near as an adult. Further, it was not disputed that Ronning had an incentive to confess, and several witnesses testified that he admitted that he fabricated the confession. . . . In

light of the . . . inconsistencies between Ronning's confession and the established facts, the trial court did not abuse its discretion in deciding that Ronning was a false confessor and that his testimony (even presuming he would testify at a new trial) would not make a different result probable on retrial. The Court of Appeals erred in substituting its judicial opinion regarding Ronning's credibility for that of the trial court.

*Cress,* 664 N.W.2d at 182–83 (internal citations omitted). The Michigan Supreme Court decision in *Cress* determined that the strength of the State's case against Mr. Cress would not be impacted by the implausible confession of Mr. Ronning. *See State v. Noble,* 591 S.W.2d 201, 207 (Mo.Ct.App.1979) ("The strength of the state's evidence at the trial is an important consideration.").

In the instant case, the State argues that because of the strength of the evidence against Mr. Smith, Mr. Sells' implausible confession would not bring about a different result at a new trial. We agree. *See State v. King,* 173 W.Va. 164, 313 S.E.2d 440 (1984) (denying new trial based upon newly discovered confession); *State v. Sparks,* 171 W.Va. 320, 298 S.E.2d 857 (1982) (same).

The evidence introduced against Mr. Smith during his trial established beyond a reasonable doubt that he killed the victims. The evidence included an admission by Mr. Smith that he stole the victims' car. The State introduced evidence to establish that the car was started with a key and was not hot-wired. There was also testimony that the victims kept the keys to the car inside the house, on a nail that was in the kitchen door. Evidence was introduced to establish that Mr. Smith stole a VCR, CB radio and a Walkman radio headset that belonged to the victims. There was testimony to show that the VCR and Walkman radio headset were kept inside the home. In addition, the evidence showed that Mr. Smith was wearing a T-shirt that belonged to Ms. Castaneda. Based upon DNA testing, it was established that blood on the T-shirt matched Ms. Castaneda's DNA profile.[45]

The record in this case does not disclose the motivation for Mr. Sells' confession to the

---

**45.** This Court has previously held that "[t]he      reliability of DNA typing analysis is now general-

murders in this case. The State suggests that Mr. Sells is using this case to delay his execution by the state of Texas.[46] This may or may not be Mr. Sells' motivation. However, it is not necessary for this Court to know Mr. Sells' motivation in confessing to the murders in this case. The only legally relevant question for this Court is whether or not the trial court had a basis for concluding that because of "the implausibility of Tommy Lynn Sells' confession, as well as the lack of integrity of the confession, ... there is [no] evidence ... that would produce an opposite result at a second trial on the merits." We find no abuse of discretion in the trial court's ruling.

"In summary, the evidence produced at the [omnibus] hearing amply supports the trial court's findings to the effect that [Mr. Sells'] confession was false ... and that even if presented at [a new] trial, it would 'undoubtedly' not have changed the result." *People v. Scheidt,* 187 Colo. 20, 528 P.2d 232, 234 (1974). *See also United States v. Kamel,* 965 F.2d 484, 494 (7th Cir.1992) ("[I]t is highly improbable that, in the face of the substantial evidence of [defendant's] guilt, the purported confessions would be believed by a second jury."); *Cody v. State,* 160 Ga.App. 86, 286 S.E.2d 321, 323 (1981) ("The trial court did not err in determining as a matter of law that the [confession] offered in support of the motion for new trial was so inherently incredible that it was unlikely to produce a different verdict upon retrial.").

## IV.

### CONCLUSION

The circuit court's order of September 14, 2007, denying Mr. Smith habeas corpus relief, is affirmed.

Affirmed.

ly accepted in this jurisdiction when such test is properly conducted by qualified personnel." Syl. pt. 3, *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989). "For a discussion of forensic DNA testing, *see* Louis J. Palmer, Jr., *Encyclopedia of DNA and the United States Criminal Justice System* 106–111 (2004)." *State ex rel. Richey v. Hill,* 216 W.Va. 155, 159 n. 5, 603 S.E.2d 177, 181 n. 5 (2004).

**46.** Mr. Sells is currently attempting to prevent his execution by claiming that he is mentally

Justice ALBRIGHT not participating.

Senior Status Justice McHUGH sitting by temporary assignment.

retarded. *See Sells v. Quarterman,* No. SA–08–CA–465–0G, 2008 WL 4264516, at *2 (W.D.Tex. Sept. 17, 2008) (permitting Mr. Sells to "file a motion requesting the appointment of a licensed mental health professional, i.e., a psychologist or a psychiatrist, to assist petitioner's counsel in connection with the investigation, development, and presentation of potential evidence addressing the issue of petitioner's possible mental retardation.").