J-S30026-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN EARL POOLE, JR. | : | |
| | : | |
| Appellant | : | No. 1739 WDA 2019 |

Appeal from the PCRA Order Entered October 28, 2019
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0001472-2017

BEFORE: MURRAY, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    FILED OCTOBER 07, 2020

John Earl Poole, Jr. appeals the denial of his request for relief under the Post Conviction Relief Act ("PCRA"). See 42 Pa.C.S.A. §§ 9541-9546. We affirm on the basis of the PCRA court's opinion.

Poole pleaded guilty in March 2018 to third-degree murder and robbery.[1] The facts giving rise to these convictions are as follows:

> On February 5, 2017, [Poole] and his friend, Robert McCarthy, (hereinafter "the victim") were drinking alcohol and smoking crack in the victim's apartment located at 539 East 9th Street in Erie, PA. At some point in the evening, [Poole] stabbed the victim several times in the head and neck, causing the victim's demise. [Poole] also took the victim's wallet and a bottle of his prescription medication and left the victim's apartment. Several hours later, [Poole] returned to the victim's apartment, doused the victim with an accelerant, and set his body on fire.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c) and 3701(a)(1)(i), respectively.

Memorandum Opinion and Order, filed 10/28/19, at 1 (quoting Pa.R.A.P. 1925(a) Op., filed 10/16/18, at 1).

The trial court sentenced Poole to 20 to 40 years' incarceration for the murder conviction and imposed a consecutive term of 10 to 20 years in prison for the robbery conviction. We affirmed the judgment of sentence. Commonwealth v. Poole, No. 1034 WDA 2018, 2019 WL 1294466 (Pa.Super. filed Mar. 20, 2019) (unpublished memorandum).

Poole filed the instant timely PCRA petition in April 2019. The PCRA court appointed counsel who filed an amended PCRA petition. Poole claimed that new evidence entitled him to withdraw his guilty plea. The evidence at issue was the alleged confession of another man, Regis Brown, that he had in fact committed the murder. The PCRA court held an evidentiary hearing and denied the petition. See Memorandum Op. and Order. This timely appeal followed. The PCRA court and Poole satisfied the requirement of Pa.R.A.P. 1925.

Poole raises the following issue before this Court:

> Whether the lower court committed legal error and abused its discretion in failing to grant collateral relief in the nature of the provision of leave to [Poole] to withdraw his guilty pleas in that the predicate cited by the lower court for denial of relief was the rejection of the confession of Regis Brown to the subject crimes subsequent to the guilty pleas as not credible should not be given any deference or affirmed by this court as said evaluation of credibility of the Brown confession was arbitrary and capricious in contravention of relevant evidence from the series of evidentiary hearings and reasonable inferences derivable therefrom?

Poole's Br. at 2.

When reviewing the denial of PCRA relief, we determine "whether the PCRA court's determination is supported by evidence of record and whether it is free of legal error." Commonwealth v. Hart, 199 A.3d 475, 481 (Pa.Super. 2018) (citation omitted).

A petitioner asserting an after-discovered evidence claim under the PCRA must plead and prove that: "'(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.'" Commonwealth v. Cox, 146 A.3d 221, 228 (Pa. 2016) (quoting Commonwealth v. D'Amato, 856 A.2d 806, 823 (Pa. 2004)).

Poole's claim that after-discovered evidence entitles him to withdraw his guilty plea is not clearly cognizable under the PCRA. Rather, the PCRA's after-discovered evidence provision affords relief from convictions and sentences resulting from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(b)(2)(vi). Where a defendant had pleaded guilty it is incongruous to say that new evidence would "change the outcome of the trial if it had been introduced," as there was no trial. Under prior law, however, such claims were cognizable in post-conviction proceedings. See Commonwealth v Peoples, 319 A.2d 679, 681 (Pa. 1974)

(construing the Post Conviction Hearing Act).[2] We do not need to resolve this question, however, because even if such claims are cognizable under the PCRA, we agree with the PCRA court that Poole's after-discovered evidence claim fails on its own terms.

Here, the PCRA court stated that the parties agreed that Poole had satisfied the first three factors of his after-discovered evidence claim. Therefore the grant or denial of his petition depended upon the last factor: whether the evidence would likely compel a different verdict. The court concluded that Poole had failed to prove this factor because Brown's statement lacked credibility "due to significant inconsistencies and discrepancies between Brown's statement and the facts of the crime." 1925(a) Op., filed 1/22/20, at 1, 7. The PCRA court summarized a portion of these discrepancies as follows:

> [S]urveillance footage in which Brown's vehicle was never seen at or near the crime scene (yet [Poole's] vehicle was present at all times relevant to the murder and subsequent arson); Brown's vague and incorrect descriptions of the victim's home; Brown's report of the suspected murder weapon and number of stab wounds which was wholly inconsistent with the autopsy report; the fact that Brown reported that the victim fell to the floor upon being stabbed yet the evidence indicated the victim had bled out on the couch; Brown's failure to mention the body was burned; and the utter lack of physical evidence linking Brown to the murder. Brown's information seemed contrived and conveniently obtained from published news reports, media

_____

[2] At least one panel of this Court has determined that such relief continues to be available under the PCRA. See Commonwealth v. Perez, No. 1704 EDA 2018, 2019 WL 4338336, at *3 (Pa.Super. Sept. 12, 2019) (unpublished memorandum).

coverage and, of course, his nearly three (3) months spent with [Poole] in the Erie County Prison.

Id. at 8.

The court then referenced the overwhelming evidence against Poole, and pointed out that Poole had voluntarily pleaded guilty to the murder.

> [T]he victim's wallet and pill bottle found in [Poole's] vehicle the morning after the murder, along with a towel containing the victim's blood found in [Poole's] trunk; eyewitness reports that [Poole] was the last person seen with the victim the night of the murder; video surveillance depicting [Poole] wearing one pair of clothes prior to the murder and a different outfit subsequent; video surveillance of [Poole']s vehicle in close proximity to the victim's home at the approximate times of the murder and also the subsequent arson; the absence of any identification of Brown in the vicinity of [the victim's] apartment and no presence of Brown's vehicle in the area; and [Poole's] own statements and behavior at the police station the morning following the murder. Finally, and perhaps most importantly, the Court considered [Poole's] own knowing, voluntary, and intelligent guilty plea to the murder and robbery of [the victim].

Id. at 8-9.

After a review of the parties' briefs, the certified record, and the relevant law, we find no error or abuse of discretion in the PCRA court's analysis. We thus affirm on the basis of the well-reasoned Memorandum Opinion and Order of the Honorable John J. Trucilla. See Memorandum Op. and Order at 1-32.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/7/2020

COMMONWEALTH OF PENNSYLVANIA     :     IN THE COURT OF COMMON PLEAS
                                 :     OF ERIE COUNTY, PENNSYLVANIA
                                 :
                v.               :     CRIMINAL DIVISION
                                 :
JOHN EARL POOLE, JR.,            :     No. 1472 - 2017


## MEMORANDUM OPINION AND ORDER

**October 28, 2019.** This matter is before this Court on John Earl Poole, Jr.'s (hereinafter "Petitioner")

Motion for Post Conviction Collateral Relief (hereinafter "PCRA") filed on April 11, 2019, and

supplemented by Attorney William Hathaway on July 19, 2019. After an independent review of the

record, consideration of Petitioner's *pro se* PCRA, the Supplemental PCRA filed by PCRA counsel, the

Responses filed by the Commonwealth, the evidence presented at the evidentiary hearings conducted on

September 30, 2019 and October 7, 2019, and the evidence presented at the status conference held on

October 15, 2019, this Court finds that Petitioner has failed to prove a meritorious claim under the Post

Conviction Relief Act (PCRA). Accordingly, Petitioner's request for relief is hereby **DENIED.**


## Factual and Procedural History

The relevant factual history was set forth in the undersigned's Opinion of October 16, 2018:

> On February 5, 2017, Defendant and his friend, Robert McCarthy, (hereinafter "the
> victim") were drinking alcohol and smoking crack in the victim's apartment located at
> 539 East 9th Street in Erie, PA. At some point in the evening, Defendant stabbed the
> victim several times in the head and neck, causing the victim's demise. Defendant
> also took the victim's wallet and a bottle of his prescription medication and left the
> victim's apartment. Several hours later, the Defendant returned to the victim's
> apartment, doused the victim with an accelerant, and set his body on fire.

(1925(a) Opinion, October 16, 2018, 1).

1

Additionally, relevant to the proceedings *sub judice*, the following facts were elicited during the hearing on Petitioner's Omnibus Pretrial Motion on October 9, 2017. On February 5, 2017, through the investigation conducted by the City of Erie Police Department ("EPD") subsequent to the discovery of the victim's body, Petitioner was identified as a person of interest. (Notes of Testimony, Omnibus Pre-Trial Motion, October 9, 2017, hereinafter "N.T., October 9, 2017", 6). At approximately 10:00 a.m. on February 6, 2017, Petitioner voluntarily drove himself to the EPD to speak with the investigators about a homicide. (N.T., October 9, 2017, 6-7). Petitioner was read his rights and signed a *Miranda* waiver. (N.T., October 9, 2017, 8). Petitioner also consented to a search of his vehicle, a search of his cell phone, and a search of his jacket. (N.T., October 9, 2017, 14-21). The victim's personal items were found in Petitioner's vehicle, including the victim's prescription pill bottle and wallet. (N.T., October 9, 2017, 92-93). Further, a towel with the victim's blood was also recovered from Petitioner's vehicle. (N.T., October 9, 2017, 93). Petitioner was the last person to see the victim alive. (N.T., October 9, 2017, 95). Additionally, Petitioner's vehicle was seen outside the victim's apartment on surveillance video. (N.T., October 9, 2017, 95-97).

As a result, on June 7, 2017, Petitioner was charged by Criminal Information with Criminal Homicide/First Degree Murder, Possessing Instruments of Crime, Aggravated Assault, seven counts of Recklessly Endangering Another Person, Robbery, Receiving Stolen Property, two counts of Arson, Abuse of a Corpse, Theft by Unlawful Taking, and Tampering With Physical Evidence.[1] The Commonwealth and Petitioner reached a plea agreement where Petitioner would plead guilty to Murder of the Third Degree and Robbery.[2] In exchange, the Commonwealth would *nolle pros* the remaining charges.

---

[1] 18 P.S. § 2501(a)/ 18 P.S. § 2502(a); 18 Pa.C.S.A. § 907(a); 18 Pa.C.S.A. § 2702(a)(1); 18 Pa.C.S.A. § 2705; 18 Pa.C.S.A. § 3701(a)(1); 18 Pa.C.S.A. § 3295(a); 18 Pa.C.S.A. § 3301(a)(1) and (c)(2); 18 Pa.C.S.A. § 5510; 18 Pa.C.S.A. § 3291(a); 18 Pa.C.S.A. § 3301(c)(2); and 18 Pa.C.S.A. § 4910(1), respectively.
[2] 18 P.S. § 2501(a)/ 18 P.S. § 2502(c) and 18 Pa.C.S.A. § 3701(a)(1)

2

On March 15, 2018, four days before jury selection was set to commence, the Petitioner appeared before this Court and entered negotiated guilty pleas to the charges of Murder of the Third Degree (reduced from Murder of the First Degree) and Robbery. All remaining charges were thereby withdrawn. At the time of the guilty plea, an extensive guilty plea colloquy was conducted by this Court wherein this Court determined Petitioner knowingly, voluntarily, and intelligently entered his plea of guilty to the charges set forth above. (*See* Plea and Sentencing Transcript, March 15, 2018, hereinafter "Tr., March 15, 2018"). Immediately following entry of the guilty plea, Petitioner waived a pre-sentence investigative report and elected to proceed with sentencing. *See* 42 Pa.C.S.A. § 9731. The Court sentenced Petitioner at Count One, Murder of the Third Degree, to a term of twenty (20) years to forty (40) years of incarceration, and at Count Eleven, Robbery, to a term of ten (10) years to twenty (20) years of incarceration consecutive to Count One. (*See* Sentencing Order, March 15, 2018).

On July 13, 2018, Petitioner filed a *pro se* "Notice of Appeal (*nunc pro tunc*)" [sic]. The Court directed Petitioner to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 3, 2018, Counsel for Petitioner filed a Statement of Intent to File *Anders* Brief as well as an Application to Withdraw as Counsel. The Court issued its 1925(a) Opinion on October 16, 2018.

On February 22, 2019, while the direct appeal was still pending with the Pennsylvania Superior Court, Petitioner filed a *pro se* PCRA in which he raised the exact issues as he has raised in the PCRA *sub judice*. By Order of March 18, 2019, the Court dismissed the February 22, 2019 PCRA as a premature filing and outside of the Court's jurisdiction. (*See* Memorandum Opinion and Order, March 18, 2019).

On March 20, 2019, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence and granted the Application to Withdraw as Counsel. *Commonwealth v. Poole*, No. 1034 WDA 2018 (Pa. Super. 2019).

3

Subsequently, Petitioner filed the instant *pro se* Motion for Post Conviction Collateral Relief on April 11, 2019. Attorney William Hathaway was appointed by this Court on April 24, 2019. On May 21, 2019, Attorney Hathaway filed a Motion for Extension of Time, requesting sixty days to file a Supplement to the PCRA. This extension request was granted by Order of May 23, 2019. On July 19, 2019, Attorney Hathaway filed a Supplement to Motion for Post Conviction Collateral Relief (hereinafter "PCRA"). At the Court's direction, the Commonwealth filed a Response to the PCRA on August 8, 2019. After reviewing the filings, the Court directed the Commonwealth to file a Supplemental Response for further clarification of some key evidentiary issues. The Commonwealth filed the Supplemental Response on September 11, 2019.

Due to the matters raised in the PCRA, the Court concluded the claim set forth by the Petitioner in the PCRA and the Responses received from the Commonwealth ". . . raised material issues of fact" requiring an evidentiary hearing pursuant to Pa.R.Crim.P. 908. Thereafter, the Court conducted an evidentiary hearing commencing on September 30, 2019 and continued on October 7, 2019, to consider the merits of Petitioner's claim. Prior to rendering a decision, the Court scheduled a final status conference on October 15, 2019, to provide counsel the opportunity to supplement the record with additional evidence or argument. At this hearing, the Commonwealth submitted Commonwealth Exhibits 4A, 4B, 4C. and 5, and rested. Petitioner offered no further evidence or testimony. Therefore, the record was closed.

4

## Discussion

### I. Relevant Legal Principles

In the PCRA, Petitioner claims, *inter alia*, he is entitled to withdraw his guilty plea pursuant to 42 Pa.C.S.A. §9543(a)(2)(vi), which provides relief where a petitioner can prove "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi). Petitioner alleges a number of claims in his PCRA seeking the withdrawal of his guilty plea couched as after-discovered evidence. Dissecting the claims, it becomes clear the only issue of legal significance, and agreed to by the parties, is whether the confession of an inmate by the name of Regis Brown is after-discovered evidence that would justify the withdrawal of Petitioner's guilty plea.[3] The Commonwealth's Response to the PCRA filed on August 8, 2019 posits Brown's alleged confession had no indicia of reliability and Petitioner's guilty plea was not unlawfully induced.

---

[3] In his *pro se* PCRA, Petitioner attached "Exhibit C", a copy of a statement allegedly signed by an inmate named Alexander Corder, regarding verbal statements allegedly made by Brown as well as reference to a letter by Brown and intercepted by Corder. Additionally, Corder sent an *ex parte* letter to the Court which was forwarded to counsel, and sent another letter to the District Attorney's office. However, neither "Exhibit C," the intercepted letter, nor the letters to the Court or the District Attorney's office were admitted into evidence.

Subsequent to the *pro se* PCRA and as discussed *infra*, at the evidentiary hearing testimony was provided directly by the Pennsylvania State Troopers who interviewed Brown. The Court was further provided with a copy of the actual recording of the interview between the Troopers and Brown, marked as Courtroom Exhibit 2, 2A. Due to the significant additional evidence submitted on behalf of Petitioner and the Commonwealth, as well as both parties' informal confirmation that neither intended to interview or present Corder as a witness, the Court can glean no relevance to Corder's involvement other than being the catalyst for the filing of the PCRA. Therefore, the Court will not rely on the statement by Corder submitted with the *pro se* PCRA in its analysis and instead will rely on the evidence properly of record.

5

## A. Alleged *Brady* Violation

As a preliminary matter, in the Supplement to PCRA Petitioner raised a claim that the Commonwealth had engaged in a *Brady* violation in failing to disclose Brown's confession. This Court notes the United States Supreme Court has held the due process requirement of *Brady* does not extend to the postconviction context, as a convicted criminal defendant ". . . does not have the same liberty interests as a free man." *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 68 (2009). Rather, the inquiry of a claim of after-discovered evidence after conviction and sentencing is governed by the state procedures for postconviction relief rather than the *Brady* framework. *Id.* at 69. Consequently, Petitioner's allegation of a *Brady* violation is not a matter for this PCRA Petition or this Court's consideration. However, out of an abundance of caution, this Court ordered the Commonwealth to specifically address the claim by identifying what information, if any, it had in its possession regarding Regis Brown's statements and his admission of killing Robert McCarthy. (*See* Order, August 27, 2019). The Court also sought this information for use in addressing the issue of after-discovered evidence.

By Supplemental Response filed September 11, 2019, the Commonwealth affirmed it had received notice of the alleged confession by Regis Brown on or about September 21, 2018, more than six months after Petitioner's entry of a guilty plea on March 15, 2018. (*See* Commonwealth's Supplemental Response to PCRA, September 11, 2019). At the evidentiary hearing on September 30, 2019, Petitioner conceded and agreed there was no basis for a *Brady* claim upon receipt of the Commonwealth's averment. Petitioner's claim of an alleged *Brady* violation is therefore dismissed as both moot and without legal relevance to this current PCRA.

6

## B.    PCRA Claim of After-Discovered Evidence

There are several avenues available to a petitioner to seek relief under the provisions of the PCRA. However, Petitioner asserts essentially only one basis for relief, that being his claim of "after-discovered evidence." (*See* Supplement to Motion for PCRA, July 19, 2019). The Court, as well as PCRA counsel and the Commonwealth, agree that only assessment and analysis of the "after-discovered evidence" subsection of the PCRA is relevant to the case *sub judice*.

The Post-Conviction Relief Act, 42 Pa.C.S.A. § 9541, et seq., "[p]rovides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa.C.S.A. § 9542. Pursuant to 42 Pa.C.S.A. § 9543(a)(2)(iv), a Petitioner must ". . . plead and prove by a preponderance of the evidence . . . (2) That the conviction or sentence resulted from . . . (vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(iv). Claims brought under this subsection are commonly termed "after-discovered evidence claims." *See, e.g., Commonwealth v. Johnson*, 179 A.3d 1105, 1123 (Pa. Super. 2018). In order for Petitioner to be eligible for post-conviction collateral relief based upon after-discovered evidence, he must prove: "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Johnson* at 1123 (citing *Commonwealth v. Cox*, 146 A.3d 221, 228 (2016)).

All parties and the Court agree that the first three prongs of what constitutes after-discovered evidence have been satisfied in this case. It is only the fourth factor – whether the after-discovered evidence would likely compel a different verdict – that is to be analyzed by the Court. In considering

7

"whether the evidence would likely compel a different verdict," the court should consider ". . . the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa.Super. 2010) (citations omitted).

Thereby, this is the legal framework the Court will confine its analysis to. The Court must consider whether the confession of Regis Brown is sufficient after-discovered evidence that would likely compel a different verdict. However, in this case, Petitioner entered a knowing, voluntary and intelligent guilty plea. Therefore, in the case *sub judice*, the issue is narrowed to whether application of the after-discovered evidence rule to the voluntariness of a guilty plea would compel this Court to allow Petitioner to withdraw his plea. For the reasons set forth *infra*, Petitioner's request for relief is **DENIED** and his guilty plea and sentence are again upheld.

## C. Withdrawal of a Guilty Plea

Generally, an appellant who has pleaded guilty "waives all claims and defenses other than those sounding in the jurisdiction of the court, the validity of the plea, and what has been termed the 'legality' of the sentence imposed." *Commonwealth v. Heaster*, 171 A.3d 268, 271 (Pa.Super. 2017). A post-sentence guilty plea may not be withdrawn absent ". . . a showing of prejudice on the order of manifest injustice." *Commonwealth v. Starr*, 301 A.2d 592, 595 (Pa. 1973). "Manifest injustice may be established if the plea was not tendered knowingly, intelligently, and voluntarily." *Commonwealth v. Broaden*, 980 A.2d 124, 129 (Pa. Super. 2009) (citations omitted).

8

Pennsylvania Rule of Criminal Procedure Rule 590 mandates that pleas be taken in open court and that the court conduct a colloquy on the record to ascertain whether a defendant is aware of his rights and the consequences of the plea. *See* Pa.R.Crim.P. 590(A)(1),(3); Pa.R.Crim.P. 590(B)(2). "[W]here the record clearly demonstrates that a valid guilty plea colloquy was conducted, during which it became evident that the defendant understood the nature of the charges against him, the voluntariness of the plea is established." *Commonwealth v. Rush*, 909 A.2d 805, 808 (Pa. Super. 2006) (citing *Commonwealth v. McCauley*, 797 A.2d 920, 922 (Pa. Super. 2001)); *see also*, Pa.R.Crim.P. 590; *Commonwealth v. Kpou*, 153 A.3d 1020, 1024 (Pa. Super. 2016). "A person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy." *Commonwealth v. Turetsky*, 925 A.2d 876, 881 (Pa. Super. 2007) (citing *Commonwealth v. Pollard*, 832 A.2d 517, 524 (Pa. Super. 2003)). "'A criminal defendant who elects to plead guilty has a duty to answer questions truthfully." *Id.*

However, the Court is fully cognizant of the Pennsylvania Supreme Court's holding in *Commonwealth v Peoples*, 319 A.2d 679 (Pa. 1974), wherein the high Court determined "[a]ny after-discovered evidence which would justify a new trial . . . also entitle[s] a defendant to withdraw his guilty plea." *Commonwealth v. Peoples* at 681. Despite the fact *Peoples* was decided under the Post Conviction Hearing Act (PCHA), the statutory predecessor of the PCRA, the holding continues to be applied in the context of after-discovered evidence claims. *See, e.g., Commonwealth v. Heaster, supra,* at n.6[4]; *see also, Commonwealth v. Perez*, 2019 WL 4338336 (Pa.Super. September 12, 2019) (a non-precedential memorandum cited for its "persuasive value" pursuant to 210 Pa. Code § 65.37).

---

[4] Procedurally, *Heaster* involved a direct appeal and request for a post-sentence motion to withdraw a guilty plea based on after-discovered evidence pursuant to Pa.Crim.R.P. 720; however, the Pennsylvania Superior Court relied on *Commonwealth v. Peoples* in analyzing the claim.

9

*Peoples* and the more recent *Heaster* and the line of cases that follow therefore suggest that the after-discovered evidence analysis applies to guilty pleas. However, the Courts go no further in these holdings. Inevitably, in an after-discovered evidence assessment done in the context of a guilty plea, when considering whether the after-discovered evidence would compel a different result, it is fair for a reviewing court to consider the underlying plea for the "overall strength of evidence supporting conviction." *See Commonwealth v. Padillas, supra* at 365. Consequently, this would warrant a review of the underlying knowledge, voluntariness, and intelligence of the guilty plea.

Instantly, Petitioner's guilty plea was knowing, voluntary, and intelligent. (*See* Tr., March 15, 2018, 3-9; 21-33; *see also* Statement of Understanding of Rights Prior to Guilty/No Contest Plea, March 15, 2018). Petitioner was found to be mentally competent, appropriately responsive, articulate, and capable of entering his plea. (*See* Tr., March 15, 2018, 7-9). The plea agreement was reviewed on the record and Petitioner acknowledged he understood his rights and the rights he would be giving up by entry of the plea. (*See* Tr., March 15, 2018, 18-22; 26). Petitioner confirmed he did not have any questions about the plea deal and verified he had knowingly and voluntarily signed the Statement of Understanding of Rights Prior to Guilty/No Contest Plea before the Court. (*See* Tr., March 15, 2018, 20-22; 26). Petitioner affirmed in his colloquy that no one had forced or threatened him to enter the plea, that he was satisfied with plea counsel, and he entered the plea voluntarily. (*See* Tr., March 15, 2018, 21-33). The Court found Petitioner's guilty pleas to Count One, Murder of the Third Degree, and Count Eleven, Robbery, were knowing, voluntary, and intelligent as well as supported by a legal and factual basis. (*See* Tr., March 15, 2018, 22-25).

The record indicates the Court underwent an extensive plea colloquy with Petitioner to ensure his understanding of his Constitutional rights and protections and the consequences of his admission. He was not forced, coerced or promised anything other than the terms of the plea agreement. His

10

statements to the Court were knowing, voluntary, and intelligently made and supported the factual and legal basis for the plea. The Information setting forth the charges with the legal definitions and elements and the factors supporting these charges were read and explained to Petitioner. (*See* Tr., March 15, 2018, 23-25). He acknowledged his understanding of these elements and admitted to committing these crimes under oath on the record. *Id.*

He cannot now claim he gave false statements regarding his culpability for the murder of Mr. McCarthy because he sees a convenient opportunity. It is well-established that ". . . post-sentence claims of innocence do not demonstrate manifest injustice." *Kpou, supra,* at 1024. In considering Petitioner's PCRA claim, it is difficult for this Court to overcome the fact that Petitioner gave a knowing, voluntary, and intelligent guilty plea. Petitioner's admission and plea is another important, if not the most important, factor impacting the "overall strength of the evidence supporting the conviction." *See, Commonwealth v. Padillas, supra* at 365.

Under this framework and the law and facts set forth below, the Court must continue its analysis of Brown's statement as after-discovered evidence to determine the integrity of the statement, the motive of Brown and Petitioner, and the overall strength of the Commonwealth's evidence supporting Petitioner's conviction. *See Commonwealth v. Padillas, supra* at 365.

11

**D.  Analysis of Petitioner's After-Discovered Evidence: Regis Brown's Confession**

At the start of the evidentiary hearing, both parties agreed with the Court that the appropriate assessment was an after-discovered evidence analysis pursuant to 42 Pa.C.S.A. § 9543(a)(2)(iv). Further, the parties stipulated prongs one, two, and three were met regarding the after-discovered evidence claim. Therefore, the only issue remaining before the Court is whether Petitioner can prove by a preponderance of the evidence that the after-discovered evidence, to-wit, Brown's alleged confession, would "likely compel a different verdict." *Commonwealth v. Johnson, supra,* at 1123; *Commonwealth v. Padillas, supra,* at 365; *see also,* 42 Pa.C.S.A. § 9543(a)(2)(iv). Further, the credibility of such evidence is fully within the purview of the PCRA Court. *See, e.g., Commonwealth v. Small,* 189 A.3d 961, 978 (Pa. 2018); *Commonwealth v. Treiber,* 121 A.3d 435, 444 (Pa. 2015); *Commonwealth v. Johnson,* 966 A.2d 523, 537 (Pa. 2009); *Commonwealth v. D'Amato,* 856 A.2d 806, 825 (Pa. 2004); *Commonwealth v. Williams,* 732 A.2d 1167 (Pa. 1999); *Commonwealth v. Lehr,* 583 A.2d 1234 (Pa. Super. 1990).

"Matters of credibility are vested in the sound discretion of . . . the PCRA court." *Commonwealth v. Lehr, supra* at 1236. In fact, it is the express duty of the PCRA court to "render its own, independent findings of fact and conclusions of law concerning . . . credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony." *Commonwealth v. Williams, supra,* at 1180-81; *see also, Commonwealth v. Small, supra,* 978. "Indeed, one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made; otherwise, issues of material fact could be decided on pleadings and affidavits alone." *Commonwealth v. Johnson, supra,* at 539.

In assessing the credibility of testimony and evidence to determine if Petitioner has met his burden of proof by a preponderance of the evidence, the Court will now undergo an intensive review of the evidentiary hearing record.

12

## 1.  Testimony of the Troopers

On September 30, 2019, Petitioner presented the testimony of now-retired Trooper Joseph Vascetti and Trooper Justin Werner of the Pennsylvania State Police ("PSP"). In September 2018, both Troopers were stationed at the New Castle barracks in Lawrence County, Pennsylvania and working in the criminal investigation unit. Trooper Vascetti had been investigating the 1988 cold case homicide of Bryce Tompkins in Lawrence County, Pennsylvania. Trooper Vascetti testified that in or about March 2018, Regis Brown, previously known as Rex Knight, confessed to murdering Tompkins. As a follow-up to the Tompkins homicide investigation, Troopers Vascetti and Werner came to Erie, Pennsylvania on September 21, 2018 to conduct another interview with Brown, who was incarcerated at the Erie County Prison. During the recorded interview (admitted as Courtroom Exhibit 2, 2A), Troopers Vascetti and Werner asked Brown about the murder of Robert McCarthy.[5] In the interview, Brown confessed to murdering Robert McCarthy and stated that he did it because McCarthy had reneged on an agreement involving drugs. It is this confession that is at the center of the PCRA set forth as after-discovered evidence.

In the statement, Brown claimed on February 6, 2017, he had driven his green 2008 Jeep Patriot to Mr. McCarthy's apartment to physically confront Mr. McCarthy about the agreement. Brown alleged the two parties had agreed to exchange cocaine for Vicodin pills. Brown stated he gave Mr. McCarthy the pills but Mr. McCarthy had not given Brown the cocaine in return. After repeated attempts to collect, Brown stated he went to Mr. McCarthy's residence to get the cocaine or money for the pills. When Brown arrived at the apartment and Mr. McCarthy gave him another excuse, Brown stated he

---

[5] Trooper Vascetti testified he had received a request from Trooper Susan Edelhman of the PSP in Erie to specifically ask Brown about the McCarthy murder. Trooper Edelhman was informed by Major Gary Seymour from the Erie County Prison that Brown had written a letter wherein Brown was taking responsibility for the murder of Robert McCarthy and Brown was concerned that "Big John" had "taken the case." All parties agree that "Big John" is a reference to Petitioner, John Poole, who is a physically large man at approximately 6'5" and 340 lbs. (*See* Sent. Tr., March 15, 2018, 45). In other words, the reference "had taken the case" meant Petitioner had taken responsibility for the murder and was serving a sentence for it.

13

pulled out his 6-inch hunting knife and stabbed Mr. McCarthy three times in the neck. Brown noted Mr. McCarthy fell to the floor and Brown had stood over top of him and left without taking anything. Although evidence and reports indicate Mr. McCarthy's upper torso was burned, Brown did not make any statements that he burned the body. Trooper Vescetti testified Brown "felt bad" Petitioner was charged in the McCarthy murder and wanted to "clear things up." Immediately after the interview the Troopers forwarded the information and recording up the PSP chain of command per standard operating procedures. The following day, the PSP notified the City of Erie Police Department ("EPD") which in turn notified the Erie County District Attorney's office.

Both Trooper Vascetti and Trooper Werner testified that Brown was cooperative and answered all of their questions during the interview. Both Troopers further opined that they felt Brown's confession was credible. However, and important to this Court's assessment, both Troopers conceded they were in no way involved with the Robert McCarthy homicide investigation and did not have the benefit of personal knowledge of the details of the McCarthy murder. The Troopers had not read any reports regarding the EPD's investigation and were not armed with any knowledge of the McCarthy murder prior to the interview. Additionally, the Troopers were unaware of whether Petitioner and Brown were housed together at the Erie County Prison in March 2018 through May 2018. Therefore, Brown could not be confronted with the facts of Mr. McCarthy's murder and Brown's statement went unverified and simply accepted by the Troopers. The Troopers had no further follow-up regarding the McCarthy murder with Brown or any officials with Erie County.

At the conclusion of the Troopers' testimony, Petitioner rested.

14

## 2. Testimony of the Commonwealth

The Commonwealth presented the testimony of Erie County Assistant District Attorney Jeremy Lightner ("ADA Lightner"). ADA Lightner was the co-prosecutor for the McCarthy murder case, and as such was intimately familiar with the evidence at the crime scene, witness statements, the autopsy report, the evidence recovered from Petitioner's vehicle, the surveillance footage around Mr. McCarthy's residence and neighborhood, and all other aspects of the investigation.[6]

ADA Lightner testified that upon receipt of the information from the PSP regarding Brown's alleged confession, the Erie County District Attorney's Office ("DA") investigated further. ADA Lightner listened to the tape of Brown's statement to Troopers Vascetti and Werner. ADA Lightner testified he found Brown's statement contrary to the facts and evidence of this case.

ADA Lightner's testimony included references to discrepancies in Brown's statement to the Troopers. ADA Lightner's testimony revealed he was personally responsible for reviewing the video surveillance evidence obtained of Mr. McCarthy's neighborhood in and around the time of the murder (February 4 and 5, 2017). ADA Lightner testified that Brown's vehicle, a green Jeep Patriot, was never seen on the surveillance footage. Conversely, Petitioner's vehicle, a Dodge Charger, was viewed several times. In fact, not only did Petitioner's vehicle appear on the video, but it was seen parked in the vicinity of Mr. McCarthy's apartment at 539 E. 9th Street at all times relevant to the murder and subsequent arson. As ADA Lightner explained, the fire had been called in by other tenants in Mr. McCarthy's building at approximately 4:00 a.m. on February 5, 2017, at which time Mr. McCarthy's charred body was discovered. ADA Lightner testified a timeline was reconstructed to determine what happened to Mr. McCarthy by utilizing the autopsy report and video surveillance. He stated the autopsy report indicated Mr. McCarthy had been deceased at the time his body was ignited, and the physical

---

[6] The other co-prosecutor in this case, former Assistant District Attorney Robert Marion, has since left the Erie County District Attorney's Office.

15

evidence regarding the cause and manner of death, including the blood loss, indicated he had died hours prior to the arson. ADA Lightner described that the primary surveillance footage near Mr. McCarthy's residence revealed Petitioner's Dodge Charger was the last vehicle parked in Mr. McCarthy's driveway on the evening of February 4, 2017. He testified Petitioner's vehicle was observed on the video driving by the victim's residence multiple times later at night on February 4, 2017 and through the early morning hours of February 5, 2017. ADA Lightner explained footage from a second surveillance camera in the neighborhood showed the Dodge Charger parked nearby Mr. McCarthy's residence around 4:00 a.m. on February 5, 2017, shortly before the report of the fire at 539 E. 9th Street was called in. He testified the fire at 539 E. 9th Street became visible on the primary surveillance video around the same time the Dodge Charger is seen leaving the area on the second surveillance video at approximately 4:00 a.m. ADA Lightner went on to conclude that based on the autopsy report and the video footage, as well as witness statements placing Petitioner with Mr. McCarthy on the evening of February 4, 2017, the Commonwealth's theory was that Petitioner murdered Mr. McCarthy at approximately 7:00 p.m. on February 4, 2017. ADA Lightner continued and stated that because of the presence of Petitioner's vehicle at the scene of the crime, and the later discovered evidence of personal items of the victim in Petitioner's vehicle, the Commonwealth believed Petitioner returned to the victim's residence at approximately 4:00 a.m. to burn the body in an attempt to conceal his involvement in the murder and robbery.

ADA Lightner testified that additional surveillance videos obtained from stores in the area indicate Petitioner changed clothes after the murder and these clothes were never recovered.

The autopsy report, which ADA Lightner reviewed with the medical examiner, Dr. Vey, indicated Mr. McCarthy had suffered nine stab wounds and the wounds were more consistent with an "unusual sharp object." ADA Lightner testified that a blue, plastic, sharp-tipped object which appeared to have

16

been broken off a larger object was found in the pool of Mr. McCarthy's blood on the couch. ADA Lightner testified that Dr. Vey would have stated this item was consistent with the type of weapon used to murder Mr. McCarthy. This is in complete conflict with Brown's testimony that he stabbed Mr. McCarthy three times with a 6-inch knife.

ADA Lightner testified that the physical evidence, including a large amount of blood on Mr. McCarthy's couch that had soaked through the couch and the lack of blood on the floor near Mr. McCarthy's charred body (*See* Commonwealth Exhibit 5) indicated Mr. McCarthy was killed on the couch and then burned on the floor. This also refutes Brown's statement that he stabbed Mr. McCarthy three times with the victim falling to the floor, and no statement by Brown regarding Mr. McCarthy on the couch or of the burning of Mr. McCarthy's body.

In his testimony regarding the strength of the Commonwealth's case against Petitioner, ADA Lightner noted that during the police interview the day following the murder, Petitioner made statements that he had "screwed up" and "he would never see his kids again." During the interview, Petitioner signed a consent for the detectives to search his vehicle, the Dodge Charger. He told the detectives they would find Mr. McCarthy's wallet and a bottle of prescription pills that belonged to Mr. McCarthy in the center console of the vehicle. ADA Lightner testified that Petitioner was observed on video surveillance from the Wine and Spirits store at approximately 7:15 p.m. on February 4, 2017, which according to the Commonwealth's theory was shortly after Petitioner had killed Mr. McCarthy. In the trunk of the vehicle the detectives found a Wine and Spirits bag with a receipt dated February 4, 2017 at 7:15 p.m. Inside the bag, the detectives found Lysol spray, wipes, and a bloody towel. Subsequent testing confirmed the blood on the towel belonged to Mr. McCarthy.

ADA Lightner testified that the most notable detail of the McCarthy murder aside from the nine stab wounds was the fact that the body had been burned. However, Brown never mentioned burning Mr.

17

McCarthy in his statement. ADA Lightner testified that Brown's confession did not contain any detail not made public.

ADA Lightner also testified that the statement by Brown was eerily similar to a statement relayed to the DA's office by an inmate named Faysal Muhammad. Muhammad, an acquaintance of Petitioner, contacted the DA's office to relay that another inmate named Tyree Salter had committed the murder of Robert McCarthy. ADA Lightner stated that further investigation into this claim was unsubstantiated and without merit. Based on this, ADA Lightner drew a parallel to this case and viewed Brown's confession as another contrived attempt by Petitioner to avoid the consequences of his heinous act. As this opinion unfolds and the record is reviewed, the Court agrees.

ADA Lightner testified that throughout the investigation there was no evidence linking any individual other than Petitioner to the crimes. ADA Lightner reiterated that there was "not one iota of evidence" linking Regis Brown to Mr. McCarthy's murder and he thereby felt Brown's statement was unbelievable and hardly exculpatory.

To further support their position that Brown's confession was fabricated and bore no credible or evidentiary value, the Commonwealth called Detective Matthew Berarducci of the City of Erie Police Department. Detective Berarducci was the lead investigator assigned to the McCarthy homicide along with Detective Sean Bogart. In fact, Detective Berarducci attended Mr. McCarthy's autopsy. Detective Berarducci elaborated on the extensive physical evidence connecting Petitioner to Mr. McCarthy's murder. His direct involvement with the McCarthy homicide armed him with the facts and details of the murder. As further emphasized by Detective Berarducci, all evidence pointed to Petitioner.

Detective Berarducci testified that after listening to Brown's statement, he also did not find it credible. He explained there was no physical evidence, eyewitness testimony, or surveillance footage linking Brown to the crime scene. When questioned about where the evidence indicated Mr. McCarthy

18

had died, Detective Berarducci testified it was believed to be on the blood-soaked couch. (See Commonwealth Exhibit 5). This again refuted Brown's confession. Detective Berarducci referenced the plastic, sharp tip found in Mr. McCarthy's blood as being consistent with the weapon used to stab Mr. McCarthy. This was supported by Dr. Vey and his autopsy report and observations.

Throughout the entirety of the investigation, Detective Berarducci had never found any connection between Brown and Mr. McCarthy. He testified there was no evidence that Brown had murdered Mr. McCarthy. Detective Berarducci found no associations between Robert McCarthy and Brown. Brown was not known by Mr. McCarthy's family members or associates. Detective Berarducci confirmed that neither the name Regis Brown nor "Rex Knight" ever came up during the initial investigation into the McCarthy murder or any time after. Brown was never mentioned as a possible person of interest and had no known connection to Mr. McCarthy.

To further support this testimony, Detective Berarducci noted that Brown was not a known drug dealer in the area. He explained the area where Mr. McCarthy's residence is located is a high crime area with a high police presence where the police routinely and proactively run license plates. A search of police records by Detective Berarducci confirmed Brown's license plate never appeared on police scans in the area. This also reinforces ADA Lightner's testimony that his review of the video surveillance footage of Robert McCarthy's residence and neighborhood never once revealed Brown's Jeep Patriot which he claimed to have driven there the night of the murder.

Further, Detective Berarducci testified that based on Brown's claim that he called Robert McCarthy on February 4, 2017, he reviewed Mr. McCarthy's phone records. The records did not contain any numbers connected to Brown.

As follow-up to listening to Brown's taped statement, Detective Berarducci stated he and Detective Bogart made several attempts to interview Brown, but were unsuccessful because Brown had

moved several times within the state prison system. Finally, on September 19, 2019, Detective Berarducci and Detective Bogart located Brown and arranged for a face-to-face interview with him. However, before questioning even commenced, Brown refused to speak with them, citing "legal and "health issues." No further interview was attempted.

Finally, to demonstrate that Petitioner and Brown had ample opportunity to manufacture this scenario, the Commonwealth called Major Gary Seymour, Deputy Warden of Security and Safety at the Erie County Prison. Deputy Seymour is the custodian of records at the prison and authenticated the logs regarding the prison cell assignments of Petitioner and Brown between March 2018 through May 2018 (admitted as Commonwealth Exhibits 2 and 3).

Major Seymour explained the configuration of the Erie County Prison and described how the prison is divided into "pods" which can hold up to 94 inmates each. Each pod is then subdivided into four smaller groups of approximately 24 inmates ("A", "B", "C", and "D") to limit the number of inmates out of their cells at one time. When they are out of their cells, inmates have unmonitored and face-to-face access to each other in the day room and/or the gym. Major Seymour confirmed Petitioner and Brown were housed together at the Erie County Prison in pod "F-B" and sleeping only three cells apart from at least March 27, 2018 to May 15, 2018. (*See also*, Commonwealth Exhibit 2 and Commonwealth Exhibit 3). Consequently, Petitioner was provided nearly unrestricted access and opportunity to share facts of the McCarthy homicide with Brown.

At the conclusion of Major Seymour's testimony, the Commonwealth rested.

20

## 3. Independent Credibility Determination by the Court

Pursuant to the duty that a PCRA Court "render its own, independent findings of fact and conclusions of law concerning [the] credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony," this Court has undertaken an exhaustive and independent review of the after-discovered evidence and the entire record in making its determination that Brown's statement is not credible and therefore Petitioner is not entitled to relief. *See, Commonwealth v. Williams, supra,* at 1180-81; *see also, Commonwealth v. Small, supra,* 978.

At the close of the hearing on October 7, 2019, the Court directed the Commonwealth to provide the Court with a copy of the audio recording of Brown's alleged confession (Courtroom Exhibit 2, 2A), a copy of the investigative report (Courtroom Exhibit 3) and the autopsy report (Courtroom Exhibit 3A). The Court subsequently listened to Brown's recorded statement and reviewed the investigative report and autopsy report.

The Court scheduled a status conference for October 15, 2019 to allow the parties to further supplement the record. The Commonwealth supplemented the record with pictures of the exterior of the McCarthy residence at 539 E. 9th Street (*See* Commonwealth Exhibits 4A, 4B, and 4C) and a picture of the interior of the crime scene (*See* Commonwealth Exhibit 5). Commonwealth Exhibit 5 displayed the blood-soaked couch and the victim's body lying on the floor next to the couch. It also showed the victim's charred upper torso.

After reviewing the testimony of record, the exhibits, the statements and arguments of counsel, and the relevant and applicable caselaw, the Court does not find the after-discovered evidence of Brown's confession credible or of sufficient reliability to justify the withdrawal of Petitioner's guilty plea. Quite simply, it does not bear an indicia of reliability or the ring of truth necessary to carry the day for satisfying the low threshold burden of preponderance of the evidence. Cognizant of its duty to assess

21

the credibility of evidence and whether the Petitioner's burden of preponderance of the evidence has been satisfied, the Court will undergo a review of the evidence of record.

First, the Court determines that ADA Lightner, Detective Berarducci, and Major Seymour provided credible evidence which was independently corroborated by other evidence and the exhibits of record.

Second, while the Court finds the testimony of Trooper Vascetti and Trooper Werner was certainly credible as to their belief about the veracity of the alleged confession, the Troopers simply did not have sufficient details about Mr. McCarthy's murder to challenge Brown's statements. The Troopers were from Lawrence County and had never worked in Erie County. Trooper Vascetti had been called upon to question Brown because of the rapport they had built working on the Lawrence County murder. Trooper Werner had never even met Brown before. Neither Trooper was involved in the investigation of the McCarthy murder, nor did they participate in any further investigation subsequent to Brown's statements.

Third, after review of Courtroom Exhibit 2, 2A, the audio recording, the Court notes while Brown's statement touched upon general details, such as the approximate location of Mr. McCarthy's home and Mr. McCarthy's physical description, these are details that could have easily been learned through public sources or interaction with Petitioner. Crucially, Brown failed to provide distinguishing details that he would have known if he was the actual perpetrator of the crime. Brown was unable to provide these crucial facts because he did not murder Robert McCarthy – Petitioner did.

The notable lack of credibility of Brown's confession is set forth as follows:

1.    Brown indicated he was familiar with Robert McCarthy and had "dealt with him a couple times and he seemed solid." (*See* Courtroom Exhibit 2, 2A). However, Brown's name never came up during the investigation into Mr. McCarthy's homicide. Detective Berarducci testified there was no

evidence that Brown was a known drug dealer in the area or even an acquaintance of Robert McCarthy. Brown's license plate had never appeared on scans in the area, which would have been expected if Brown was dealing drugs in the area. There were no witnesses placing Brown at the crime scene, whereas Petitioner was identified by Robert McCarthy's neighbor, Kim Barnes, as the last person seen with Mr. McCarthy on the evening of February 4, 2017. (*See also*, Commonwealth Exhibit 1). ADA Lightner's testimony further corroborated Detective Berarducci's testimony regarding the lack of a connection between Mr. McCarthy and Brown, as his review of the video surveillance of Robert McCarthy's residence and neighborhood never captured Brown's vehicle. It did, however, consistently show Petitioner's Dodge Charger. There is absolutely no independent evidence of any kind that Brown even knew Robert McCarthy and clearly nothing connecting Brown to Robert McCarthy's homicide. The Court does not find Brown's statement that he "knew" Robert McCarthy to be credible.

2.     Brown stated he drove to McCarthy's residence in his green Jeep Patriot. (*See* Courtroom Exhibit 2, 2A). This is completely belied by the surveillance footage obtained from the area the night of the murder. Not only is there no footage of Brown's vehicle parked nearby, but every other vehicle that appeared in the footage was identified and none had a connection to Brown. As ADA Lightner testified, he personally reviewed the entire surveillance video and no vehicle matching or resembling a green Jeep Patriot appears at any point. In fact, ADA Lightner testified at no time was a Jeep of any kind observed the day or night of the murder (February 4 and 5, 2017). Conversely, Petitioner's vehicle, a Dodge Charger, was seen multiple times throughout the evening. The Court finds ADA Lightner's testimony reliable and corroborated by the credible testimony of Detective Berarducci that there was nothing connecting Brown to Mr. McCarthy or to the crime scene. Therefore, these factors render Brown's statement false.

23

3. Brown confessed that he called Mr. McCarthy on the telephone early in the evening before the murder prior to arriving at the residence. (*See* Courtroom Exhibit 2, 2A). Detective Berarducci testified there was no phone activity from Mr. McCarthy's number after 6:15 p.m. on the evening of February 4, 2017. Upon receiving Brown's confession, Detective Berarducci reviewed Mr. McCarthy's phone records and found no record of calls with the number connected to Brown. The phone records did, however, show phone calls between Mr. McCarthy and Petitioner. The Court finds Brown's claim he called Mr. McCarthy the evening of February 4, 2017 is not credible.

4. Brown identified the address of the McCarthy residence as "592 East 9th Street" and described the residence as "a regular house" with "white siding" and "little steps." (*See* Courtroom Exhibit 2, 2A). First, the Court takes judicial notice that there is no "592 E. 9th Street" in Erie, Pennsylvania, Further, "592" is not even an inverted derivative of the correct address of 539 E. 9th Street, Mr. McCarthy's residence. Next, Brown's description of the McCarthy residence is also inaccurate and lacks credibility. As depicted in the photos at Commonwealth Exhibit 4A, 4B, and 4C, Mr. McCarthy's residence was not a "regular house" but was part of a larger house converted into apartments. As police reports and testimony reveal, Mr. McCarthy's residence at 539 E. 9th Street was part of a four unit apartment complex. While the portion encompassing 539 E. 9th Street does have white siding, the front of the building is mainly comprised of brown stone. There are no "little steps" to the door; instead, the property has a large wooden handicapped ramp leading up to the door. Mr. McCarthy's apartment at 539 E. 9th Street has a bright red door, red porch, and red iron post. When asked by Trooper Vescetti to describe Mr. McCarthy's home, Brown never mentioned a home with a handicapped ramp, or the apartment with a red door, or the house with the stone front façade and two doors in the front. None of these unique and distinguishing factors were stated by Brown. Brown's generic description and lack of detail reveal his unfamiliarity with Mr. McCarthy's residence and also

24

rings untrue. The Court finds that Brown's claim that he was ever at Mr. McCarthy's home the night of the murder or any other night is not credible.

5. In his statement, Brown claimed he used a 6-inch hunting knife to attack Mr. McCarthy. (*See* Courtroom Exhibit 2, 2A). While it is true that Mr. McCarthy was stabbed and the weapon was not located, there was an evidentiary inference that the sharp plastic tip found in the puddle of blood on the couch was a remnant of the murder weapon as it was consistent with the victim's wounds. ADA Lightner and Detective Berarducci testified that based upon the investigation and a review by the forensic examiner, Dr. Vey, the pointed piece of plastic was consistent with Mr. McCarthy's wounds. Brown's claim that he used a hunting knife that he later "threw into Lake Erie" also appears contrived.

6. Brown also stated he stabbed Mr. McCarthy three times. He specifically stated he stabbed Mr. McCarthy once "in the side of the neck," "in the back of the neck," then again "in the side of the neck." (*See* Courtroom Exhibit 2, 2A). This statement is entirely inconsistent with the forensic findings. In the autopsy report (admitted as Courtroom Exhibit 3A), Dr. Vey determined Mr. McCarthy had been stabbed nine times. Specifically, the autopsy report indicates:

ANATOMIC DIAGNOSES:

I. NINE SHARP FORCE INJURY WOUNDS TO THE HEAD AND NECK.
   A. SUPERFICIAL STAB WOUND TO THE LEFT OCCIPITAL SCALP.
   B. SUPERFICIAL SHARP FORCE INJURY WOUND TO THE POSTERIOR MEDIAN MID NECK.
   C. FOUR PREDOMINANTLY SUPERFICIAL SHARP FORCE INJURY INCISED WOUNDS TO THE LEFT SIDE OF THE NECK.
   D. THREE STAB WOUNDS TO THE RIGHT SIDE OF THE NECK.
      1. STAB WOUND #8 WITH PENETRATION INTO THE RIGHT INTERNAL CAROTID ARTERY AND HYPOPHARYNX.
      2. STAB WOUND #9 WITH PENETRATION INTO THE LARYNGOPHARYNX.

25

(Courtroom Exhibit 3A). Clearly, Brown's claim that he stabbed Mr. McCarthy three times is in absolute conflict with the autopsy report and the fact that the victim suffered nine stab wounds. This evidence belies Brown's confession.

7. Brown's statement is further dismantled by his claim that after stabbing Mr. McCarthy, he left him lying on his back in the living room. However, this is inconsistent with the evidence at the crime scene. It was determined that Mr. McCarthy had bled out on his couch and was moved to the floor before his body was burned. (*See also*, Commonwealth Exhibit 5). In fact, according to Detective Berarducci who was present at the scene of the crime, blood had "soaked through the frame of the couch." Commonwealth Exhibit 5, the picture of the interior of the residence, shows Mr. McCarthy's charred body lying on the floor next to a blood-soaked couch. There is no visible blood on the floor. Therefore, Brown's claim that Mr. McCarthy was stabbed three times and fell to the floor is again in conflict with the physical evidence at the crime scene and thus not credible.

8. Furthermore, Brown never mentioned anything about burning the body. Anyone with first-hand knowledge of the crime would know Mr. McCarthy's body was burned from the waist up. As ADA Lightner testified, that fact was so distinct that the case was locally known as "the burned body case." Detective Berarducci responded to the scene and took photographs of the body. The image of Mr. McCarthy's charred body is depicted in Commonwealth Exhibit 5. Though Petitioner may argue that Brown committed the murder and someone else came back later and burned the body, there is a dearth of evidence supporting this theory. There was overwhelming testimony that nothing connected Brown to this crime and the overall strength of the evidence against Petitioner was strong. The most rational conclusion this Court can draw is because Brown lacked the knowledge of burning the body, he

26

did not commit the murder. Although perhaps not the most persuasive factor to discredit Brown's confession, it is a factor nonetheless worthy of consideration.

Finally, in assessing the credibility of Brown's statement, it is not lost on the Court that Brown is serving life without parole for his double homicide and therefore faces no punitive consequences for admitting to another murder. In fact, as testified to by Trooper Vascetti, Brown may be described as somewhat of a serial killer because of his suspected role in other homicides.

Based on the above, the Court does not find Brown's alleged confession to be credible. The vague details provided by Brown wholly conflict with the reality of the autopsy findings, the evidence at the crime scene, and the other physical and circumstantial evidence linking Petitioner alone to the crime (*see* review of evidence and testimony from evidentiary hearing, *supra*). Instead of specific details of the crime, Brown provided somewhat generic descriptions which could easily be obtained from public sources or the Petitioner himself. Having presided over all stages of Petitioner's case, this Court is intimately familiar with the extensive media coverage it generated, which included details of the homicide as well as depictions of the victim's home. Further, it does not take an extraordinary leap of faith to think that Petitioner and Brown could not have concocted this scheme while they spent six weeks together in the same pod at the Erie County Prison.

The Court is not swayed by the general details Brown was able to provide in his statement. Petitioner may argue that Brown correctly identified the block on which the homicide occurred; that he identified the general location of the wounds; or that he gave an accurate physical description of Mr. McCarthy. However, the credibility of Brown's statement disintegrates when the minutia and detail of the crime is considered. The overall weight of Brown's statement crumbles under the weight of the evidence and overall strength of the Commonwealth's case against Petitioner, including Petitioner's own

27

plea of guilty. Quite simply, Brown's incredible account fails to survive as after-discovered evidence and consequently, Petitioner cannot satisfy his burden necessary for relief.

The Court has canvassed the Pennsylvania appellate courts for precedent and guidance. However, there is limited Pennsylvania caselaw concerning cases involving a collateral appeal seeking relief based on after-discovered evidence and the withdrawal of a guilty plea. Making this case unique is that the after-discovered evidence is the confession to a murder by another inmate. However, the Court finds support for its finding in decisions by sister-states faced with strikingly similar circumstances. For instance, in *People v. Cress*, 664 N.W.2d 174 (Mich. 2003), the Supreme Court of Michigan considered a confession by an inmate, Ronning, to a murder for which another man, Cress, was convicted and concluded the confession conflicted with the established facts and that Ronning was not credible. In 1985, Cress was convicted of murdering seventeen-year-old Patty Rosansky. In 1997, Ronning, housed in a prison in Arkansas, agreed to confess to multiple murders in exchange for a transfer to a prison in Michigan closer to his family. In his alleged confession, Ronning gave details about the murder of Ms. Rosansky. Specifically, he stated she did not struggle; he removed her clothing but did not penetrate her anus; he murdered her by strangulation; and after she died he threw a rock at her head. *People v. Cress, supra*, at 177. Ronning accompanied police twice to try to identify the crime scene and described it as "a clearing" and a "flat piece of ground, a clearing next to a two-track." *Id.* at 180.

The court in *Cress* conducted a hearing during which it heard testimony from four expert witnesses regarding the manner of death, which was determined to be multiple blows to the victim's head. *Id.* at 179, 182. The weapon used was described as a rod-shaped object. *Id.* The victim had been anally penetrated. *Id.* Testimony was presented regarding the presence of defensive wounds on the victim, and the lack of evidence of strangulation. *Id.* Most compelling to the court was Ronning's

28

inability to identify the crime scene, as the victim's body was found not in a clearing, but in a ravine near identifiable landmarks. *Id.* at 180. The court stated: "When looking at the differences between inmate's description and photos of crime scene, the difference in topography and terrain is dramatic. When one compares his description of the crime scene to the actual crime scene, the only reasonable conclusion one can draw is that Mr. Ronning didn't know where the crime scene was because he did not commit the crime." *Id.* at 181 (internal citations omitted). The court found Ronning's confession riddled with inconsistencies and concluded that he was not credible. *Id.* at 183.

Likewise, in the case of *State ex rel. Smith v. McBride*, 681 S.E.2d 81 (W.Va. 2009), the Supreme Court of Appeals of West Virginia considered the confession by a death row inmate, Sells, to the murders of a mother and daughter for which another man, Smith, was convicted and found the confession to be incredible and not aligned with the true facts. During Smith's trial, some of the compelling evidence introduced included Smith's admission that he stole the victims' car; the fact that a key was used to start the car and the car keys were kept inside the victims' house; Smith had stolen a VCR, CB radio and a Walkman, all of which were kept inside the victims' home; and the t-shirt Smith was wearing belonged to the daughter and the daughter's blood was found on the shirt. *State ex rel. Smith v. McBride, supra,* at 95. Several years after Smith was convicted, Sells gave a videotaped confession to prison officials at the Texas prison where he was serving on death row. *Id.* at 87. Sells claimed he was actually the one who had killed the victims, stating he had met the daughter during a drug deal and she allowed him to live in the attic (which he described as an upstairs apartment that had a bedroom and bathroom) without the mother's knowledge. *Id.* After several days, the mother discovered Sells was living in the attic and after an argument Sells stabbed both victims. *Id.* Sells stated there was a dog in the house but he would never harm a dog. *Id.* Sells described the crime scene as having a brown couch with a black afghan. *Id.* He stated after the murder he stole a CB radio and left the house

29

on foot. *Id.* Sells acknowledged he and Smith were in prison together for a period of time in West Virginia but claimed they did not have contact. *Id.* at 87-89.

During the hearing on the after-discovered evidence of Sells' confession, the court heard testimony from the investigating officer that the victims had two dogs, one of which was found killed and hidden in the laundry room. *Id.* at 88. The only CB radio the victims had was the same one taken by Smith. *Id.* It was proven the victims did not have a couch with a black afghan, and more importantly, the victims' home did not have an upstairs bedroom and bathroom. *Id.* Upon review of the alleged confession and its discrepancies with the facts of the case, the court found Sells confession was implausible and not credible. *Id.* at 96.

Here, as the courts determined in *Cress* and *McBride*, this Court finds Brown's alleged confession inconsistent with the facts of the case and simply not credible when considered in totality of all the facts and evidence of record. Rather, this Court recognizes this after-discovered evidence claim as a desperate attempt by Petitioner to take advantage of the serendipitous circumstances of being housed together in pod F-B at the Erie County Prison with Brown, who was an inmate who was being investigated for committing several other homicides (*See* testimony of Trooper Vascetti, *supra*).[7] It is inconceivable that Petitioner and Brown weren't aware of each other when they were housed together in pod F-B at the Erie County Prison for the better part of two months with daily access to each other. It does not require a stretch of the imagination to consider Petitioner may have convinced Brown, an easy target facing life imprisonment with no possibility of parole and already on the police radar for other

---

[7] Regis Brown was charged with two counts of Murder/Homicide, *inter alia*, at Docket No. CP-25-CR-0001608-2018 in Erie County, Pennsylvania for killing his wife and stepdaughter. Brown was also being investigated for the 1988 Lawrence County murder of Bryce Tompkins, and was formally charged in that case in October 2018. Trooper Vascetti testified he also suspects Brown may have murdered Dawn Morgan in Erie County in 1988, but the case was ultimately cleared due to the inability to establish cause or manner of death.

30

murders, to take the fall for McCarthy's murder too. Brown's confession lacked the necessary detail to make it credible because he did not commit the murder of Robert McCarthy. The Petitioner did.

Petitioner has not met his burden of proof. Specifically, he has not proven by a preponderance of the evidence that exculpatory evidence has become available that would have changed the outcome if it had been introduced. *See* 42 Pa.C.S.A. § 9543(a)(2)(iv). The Court has considered the "integrity of the after-discovered evidence" of Brown's alleged confession and, as discussed in detail above, has found it lacks overall integrity. *See Commonwealth v. Padillas, supra,* at 365. This is premised on the following: Brown had no known connections to the victim; the surveillance footage did not place his vehicle at or near the victim's residence; Brown's lack of detail in describing the victim's home; the error in the number of wounds inflicted; and other inconsistencies as set forth in this Opinion, *supra*. Pursuant to *Padillas, supra*, the Court has considered the various motivations of Petitioner and Brown in offering the evidence and finds Petitioner certainly has a strong motive in being permitted to withdraw his guilty plea while Brown truly has nothing to lose in taking the blame. *Id.* The Court has also considered the "overall strength of the evidence" against Petitioner and finds the evidence supports the Commonwealth's assertion that Petitioner was the individual who murdered Mr. McCarthy. *Id.* This would include the following substantial physical evidence connecting Petitioner to Mr. McCarthy's murder: Mr. McCarthy's personal items (wallet and pill bottle) found in Petitioner's vehicle; the towel with the victim's blood found in Petitioner's vehicle; the cleaning supplies found in the trunk of Petitioner's car; witnesses placing Petitioner with Mr. McCarthy immediately prior to the murder; Petitioner's changing his clothes subsequent to the murder; Petitioner's vehicle being in close proximity to Mr. McCarthy's apartment at the approximate times of the murder and the subsequent fire; and Petitioner's statements that he "screwed up" and "would never see his kids again." The overall strength

of the Commonwealth's case is also bolstered by Petitioner's own knowing, voluntary, and intelligent guilty plea to the murder and robbery of Robert McCarthy.

Therefore, on application of the after-discovered evidence analysis, this Court finds there is nothing set forth by Petitioner that is likely to have compelled a different outcome, and no manifest injustice has occurred to permit Petitioner to withdraw his guilty plea. Petitioner is not entitled to relief.

## Conclusion

Upon a review of the PCRA, the Supplemental PCRA, the responses by the Commonwealth, and the entirety of the record, including the evidentiary hearing and exhibits, this Court has determined Petitioner's after-discovered evidence claim is patently frivolous and without factual or legal support. Rather, as discussed in-depth *supra*, this Court views the claim as an opportunistic attempt by Petitioner to take advantage of a sensational local news story to attempt to re-litigate convictions for which he accepted culpability and entered a knowing, voluntary, and intelligent guilty plea. Therefore, Petitioner's PCRA is hereby **DISMISSED** and his request for relief is **DENIED**. An Order will follow.

BY THE COURT:

Hon. John J. Trucilla, President Judge

cc: Michael Burns, Esq., Office of the District Attorney
William R. Hathaway, Esq., 1903 West 8th Street, PMB # 261, Erie, PA 16505
John Earl Poole, Jr., #NK0508, SCI –Forest, Unit HA-2042, Box 945, Marienville, PA 16239 *(via certified mail)*

32